IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

_____

MARCIE D. VADNAIS,                    :        CIVIL ACTION NO.:
                                      :
        Plaintiff,                    :
                                      :
                                      :
v.                                    :
                                      :
                                      :
SIG SAUER, INC.                       :        JURY TRIAL DEMANDED
                                      :
                                      :
        Defendant.                    :        May 4, 2018

_____

## **COMPLAINT**

Plaintiff Marcie D. Vadnais ("Vadnais"), for her Complaint seeking damages, equitable

relief, and judgment against defendant Sig Sauer, Inc. ("SIG"), alleges as follows:

## **NATURE OF ACTION**

This action arises from defendant Sig Sauer, Inc.'s negligence and deceptive marketing

practices regarding a semi-automatic firearm. Specifically, a semi-automatic gun known as

the P320.

On February 7, 2018, Vadnais, a seven-year veteran of the Loudoun County, Virginia

Sheriff's Department, was removing her fully-holstered P320 from her duty belt. In the process

of removing the holster, the gun fired one round into her thigh, shattering her femur in several

places and causing massive blood loss and other internal injuries. At no time during this incident did she touch the trigger, which at all times was inside and covered by a SIG-manufactured holster.[1]

On impact with her femur, the discharged round broke into many pieces, leaving numerous pieces of shrapnel and bone shards within her leg. Emergency room surgeons inserted a steel rod to make it possible for Vadnais to walk. It is attached to her pelvis and knee with screws and will remain there the rest of her life.

Vadnais's P320 never should have discharged without the trigger being touched, holstered or un-holstered. In its "Safety Without Compromise" marketing materials for the P320, SIG states:

> "We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to."

Despite this express representation, which SIG has made for the last several years to the present day, the weapon fired without the trigger being touched.

Vadnais brings a cause of action seeking actual, compensatory, and punitive damages under the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110(b), for unfair and deceptive trade practices in their marketing of the weapon, as further described below. She

---

[1]     In the weapons industry, this type of discharge is typically referred to as an inadvertent or unintended discharge in which the weapon fires without a trigger pull.  *See, e.g., O'Neal v. Remington Arms Co., LLC*, 817 F.3d 1055, 1060 (8th Cir. 2015) (referring to "inadvertent discharge" of weapon "without the trigger being pulled").

also brings causes of action under Connecticut common law for negligent and intentional infliction of emotional distress in view of Sig's misleading representations about the safety of the weapon, as well as the company's knowledge, more than a year before February 2018, that the weapon required immediate and significant modifications to make it less prone to fire without the trigger being pulled. Had those changes been made when they should have been, Vadnais's thigh bone would not have been blown in half.

SIG, upon information and belief, fixed defects in the prototype military version of the P320, installing a lighter trigger and internal modifications to prevent unintended discharges, as early as 2016, while competing to obtain a contract worth more than $580,000,000 with the United States Army. It successfully obtained the latter in January 2017.

Despite knowledge of safety defects with the P320 as early as 2016, however, SIG has negligently and recklessly failed to issue a mandatory recall of the commercial version, owned by civilians and law enforcement agencies all over the country.

## JURISDICTION

1.      Jurisdiction is founded on diversity of citizenship pursuant to 28 U.S.C. § 1332. Plaintiff Vadnais is a citizen of the United States and the Commonwealth of Virginia. Defendant Sig Sauer, Inc. has a principal place of business in New Hampshire. The amount in controversy exceeds, exclusive of interest and costs, $75,000.

## VENUE

2.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) as a

substantial part of the events or omissions giving rise to the action occurred in this district.

## PARTIES

3.      Vadnais is a natural person and resident of the Commonwealth of Virginia, who

suffered severe, permanent physical injury as a direct and proximate result of the negligence

and breach of warranties and deceptive marketing practices of SIG.

4.      Sig Sauer, Inc. designs and manufactures firearms for military and commercial

In Virginia, across the United States, and internationally.

It markets and sells its products through dealers. Sig Sauer, Inc. was formerly known

as SIGARMS, Inc. and changed its name to SIG SAUER, Inc. in October 2007. The company

was founded in 1985 and has its principal place of business in Newington, New Hampshire.

## ALLEGATIONS

5.      The incident occurred on the morning of February 7, 2018 while Vadnais was

arriving for a General Instructor Course at the Northern Virginia Criminal Justice Academy

(NVCJA).

6.      Because NVCJA policy prohibits live rounds and weapons in the Academy other

than for staff members, she was required to remove her holstered pistol from her right hip

before she entered the premises.

7.      The round discharged from the weapon without the trigger or gun being touched,

while she was in the process of removing her SIG-issued paddle holster, with the pistol

contained within it, from her right hip.

8.     Vadnais placed her right hand on the largest portion of the holster and used her

left hand to feed her 5-11 nylon belt through the teeth of the holster.

9.     While feeding her belt through the first tooth of the holster, the P320 fired one

nine millimeter bullet, which hit her in the upper right thigh. The round shattered her right femur

in half, narrowly missed her femoral artery, and broke apart into many pieces.

10.     X-rays taken after the incident show the massive damage to her right leg, along

with shrapnel and bone fragments that will remain in her leg for the indefinite future.

11.     Her physicians currently estimate that there is a 20% chance they will try to

remove them in a year, if it can be done without further damage to her leg and femur. The latter

bone will be held in place for the rest of her life by a steel rod secured to her knee with two

screws, and to her hip joint with one.

12.     While the full extent of the physical damage to her leg is not yet known, it is
likely

that she will have trouble ever running or walking normally again, and may not be able to return

to her position as a result.

13.     The incident has resulted in substantial physical harm and related trauma to

Vadnais, 37, who has received substantial and ongoing pain-killing narcotics to deal with the

injury and function on a day-to-day basis.

14.     Years before the incident occurred, through and including the date of the incident

and the present day, SIG expressly represented that "[w]e've designed safety elements into every necessary feature on this pistol.  From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to":



15.     In additional marketing material, under the heading "Striker Safety," defendant SIG SAUER further states:  The Striker Safety "[p]revents the striker from releasing *unless the trigger is pulled*."  (emphasis added).

16.     At the same time, SIG SAUER contradictorily stated in the original owner's manual for the P320, on page 25, that the weapon may fire if dropped without the trigger being

pulled if the chamber is not empty.

17.     It is, however, standard operating procedure for all U.S. law enforcement agencies, local police departments, and the military, at a commander's discretion, to carry pistols with a chambered round.

18.     SIG was aware of this fact at the time it designed and manufactured all its pistols including the P320.

19.     Sometime in 2017, after a Connecticut law enforcement agent was shot by a P320 when it fell to the ground from less than three feet, it accordingly removed the warning on page 25 regarding carrying a chambered round, and replaced it with the following language:

 All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to fail to work as designed. After suspected exposure to these conditions, have the firearm checked by a certified armorer before using. Mechanical safeties are designed to augment, and not replace safe handling practices. **Careless and improper handling of any firearm can result in unintentional discharge.**

(emphasis in original).

20.     SIG had never before represented that mere "vibration" could cause the weapon to discharge.

21.     Moreover, it had also expressly represented since its manufacture and distribution into the stream of commerce that the weapon was also drop safe without a safety:



22.     SIG's original design and manufacture of the P320 in 2014, or earlier, rendered the weapon unreasonably dangerous for its intended uses, and for any foreseeable uses and accidents involving its intended uses, at the time SIG sold it to Vadnais's Department.

23.     Specifically, upon information and belief, the mass and weight of the P320 trigger was far too large and heavy, rendering the weapon susceptible of inertia-based discharges.   In addition, it lacked a mechanical disconnect device within the weapon (which has since been added for purchasers who ask SIG to install one), possessed an inadequate sear, and any external safety or tabbed trigger safety.

24.     When in June 2017 SIG shipped approximately 700 P320s to the Loudoun County Sheriff's Department where Vadnais was employed, it knew, or should have known, that the weapon was defective and unreasonably dangerous for its ordinary uses, intended uses, and all other foreseeable uses and accidental discharges that could occur in the ordinary course of using the weapon.

25.     Before it shipped these weapons, it was aware of accidental discharges of the P320 weapon, and other SIG pistols, many of which pre-dated and post-dated, the June 2017 sale to the Loudoun County Sheriff's Department.

26.     Upon information and belief, there had been many prior incidents of unintended discharges involving SIG weapons that have discharged without the trigger being pulled, or simply while being handled, accidentally dropped, or while being holstered.

27.     For example, from 2005 to January 2011, the San Francisco Police Department reported 29 accidental discharges (a time when it issued SIG Sauers as its primary sidearm).

28.     In 2002, a San Fernando police officer dropped his SIG Sauer, causing an

accidental discharge that killed him, refuting claims the trigger must be pulled to fire the gun.

29.     In 2008, an officer in Connecticut accidentally discharged his SIG Sauer while holstering it.

30.     In 2011, a security guard in St. Louis dropped his SIG Sauer, unintentionally shooting someone.

31.     In 2012, a New York transit officer accidentally discharged his SIG Sauer while holstering it.

32.     In 2014, a federal air marshal in New Jersey unintentionally shot himself while handling his SIG Sauer service weapon.

33.     In 2015, a Pennsylvania state trooper and firearms instructor accidentally killed another trooper with his SIG Sauer while conducting safety training.

34.     In 2016, a tactical response training instructor near Sacramento dropped his SIG Sauer, firing a bullet into a student's truck.

35.     In the period between 2012 and 2015, the New York City Police Department reported 10 accidental discharges involving Sig Sauer weapons.

36.     In 2017, a sheriff's deputy in Michigan accidentally discharged his SIG Sauer, striking a schoolteacher in the neck.

37.     On January 5, 2017, a P320 shot a Stamford SWAT team member in his left knee when the pistol fell from a distance of less than three feet to the ground while fully

holstered, refuting SIG's express representations that the weapon is drop safe, and does not require a safety to be drop safe.

38.     On February 28, 2017, a P320 accidentally discharged while in use by the University of Cincinnati Police Department.

39.     On June 14, 2017, a P320 accidentally discharged in Wilsonville, Oregon.

40.     On June 20, 2017, a P320 accidentally discharged while in use by the Howell Township, NJ Police Department.

41.     In June of 2017, SIG shipped approximately 800 P320s to the Loudoun County Sheriff's Department, privately assuring its leadership that the problems with the weapon would be fixed, but that "for now," it had to deal with the weapon as currently manufactured and designed.

42.     On July 28, 2017, a P320 accidentally discharged in Tarrant County, Texas.

43.     On August 4, 2017, a Stamford SWAT team member sued SIG in U.S. District Court in Connecticut for an accidental discharge of a commercial version of the P320 which shot him in his knee.

44.     On August 8, 2017, SIG's CEO released a statement stating:  "there have been zero (0) reported drop-related P320 incidents in the U.S. Commercial market."

45.     This was statement was false, in view of SIG's knowledge that Officer Sheperis in Connecticut had been shot by a drop fire some eight months earlier with the

commercial version of the P320, and that several other accidental discharges of the P320 had occurred before that date.

46.     On August 8, 2017, SIG announced a "voluntary upgrade" program for the P320 pistol, stating that the pistol meets "rigorous testing protocols for global military and law enforcement agencies."

47.     The upgrade program, which was presented to the public as purely optional, not urgent, and not mandatory, offered to make existing commercial versions of the P320 "better" by installing a much lighter trigger, and internal disconnect switch, and an improved sear to prevent accidental discharges.

48.     On August 9, 2017, the police chief of Morrow, Georgia issued an emergency order removing the P320 from service.

49.     On August 16, 2017, the Dallas Police Department issued a recall of the P320 due to drop safety concerns, prohibiting its use by officers until repaired.  In an interdepartmental memo, it stated:

> Sig Sauer has identified that there is a defect in the P320 handgun that could cause the weapon system to go off when dropped. The Sig Sauer P320 was approved for primary duty, secondary primary duty, and back-up use. The Firearms Training Center is currently working with Sig Sauer to obtain a solution for the safety issue. Until Sig Sauer is able to find a solution to the safety issue, the Sig Sauer P320 is no longer approved by the Dallas Police Department for any use.

50.     In October 2017, a P320 accidentally discharged in Georgia when an officer fell to the ground in pursuit of a suspect.  His weapon was holstered and fired simply when he struck the ground.

51.     On November 12, 2017, a P320 accidentally discharged in Tyler, Texas.

52.     In January 2018, upon information and belief, a P320 accidentally discharged in Dallas County, Texas.

53.     On February 7, 2018, as noted, Vadnais's P320 accidentally discharged in Virginia, severing her right femur and causing massive blood loss.

54.     Upon information and belief, employees at Sig Sauer's own training academy in New Hampshire have admitted to accidental discharges causing injury in both 2016 and 2017.

55.     To date, SIG has never issued a mandatory recall of the P320 for repairs, though it has done so in the past for other of its products.

56.     In an interview in 2013, SIG's Chief Financial Officer, Timothy Scullin, noted that

Sig's revenue rose approximately 1,400 percent from 2012 to 2013 and stated that Sig Sauer's

Growth has outpaced its industry's growth by "two or three times."

57.     When asked what some of his biggest professional challenges he has faced in his career, he stated:

> At SIG, to grow this fast, people get really challenged.  When you're growing 70 to 80 percent in a year, all the systems get stretched, and the people really get stretched. You have to be able to manage multiple tasks in a very fast environment, and in an environment that's highly regulated, so you can't mess up, otherwise you get shut down. It just creates a tremendous of stress on the people in the system. But we've got people that have risen to the challenge.

## COUNT I

## NEGLIGENCE

## (FAILURE TO WARN, NEGLIGENT ASSEMBLY OR MANUFACTURE, NEGLIGENT DESIGN)

58.　　Vadnais readopts and re-alleges all of the preceding paragraphs of this pleading as if fully set forth herein.

59.　　At all relevant times, SIG owed Vadnais the duty to design the P320 weapon In such a manner and with the exercise of reasonable care, so as to prevent it from firing upon her merely handling the holster in which it was situated before selling the gun and placing it into the stream of commerce. To the extent SIG did not owe this duty under existing Virginia law, it assumed such a duty by virtue of its past conduct.

60.　　At all relevant times, SIG owed Vadnais the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing upon her merely handling the holster in which it was situated, before selling the gun and placing it into the stream of commerce. To the extent the SIG did not owe this duty under existing Virginia law, it assumed such a duty by virtue of its past conduct in recalling other defective weapons from the marketplace.

61.　　At all relevant times, SIG owed a duty to unambiguously and adequately warn consumers and/or intended users of the P320, including Vadnais, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, SIG knew or had reason to know that the P320 posed an unreasonable risk of harm by

virtue of informal and formal claims arising from substantially similar incidents pre-dating this lawsuit, internal testing and research, industry publications and research, and other sources of information to be developed in discovery. To the extent SIG did not owe this duty under existing Virginia law, it assumed such a duty by virtue of its past conduct in recalling other defective weapons from the marketplace.

62.     SIG breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.      By failing to use due care in designing and manufacturing the P320's trigger, including but not limited to its mass and weight, so as to prevent accidental discharges;

ii.     By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, so as to prevent accidental discharges;

iii.    By failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products, and instead announcing a "voluntary upgrade" of the weapon, which it knew to be defective and prone to accidental discharges based on all available information in SIG's possession as of August 2017, if not much earlier;

iv.     By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally as described above;

v.      By negligently failing to unambiguously and adequately warn purchasers and end

users of the gun, including Vadnais, of said defective, hazardous and unreasonably dangerous

conditions relating to its design and manufacture, which it knew or should have known through

the exercise of ordinary care;

vi.    By failing to discover the defective, hazardous and unreasonably dangerous

conditions relating to the gun's propensity to discharge accidentally,.e.g, if "vibrated" in some

unspecified fashion, while in the possession of SIG, and during which times employees,

servants or agents of SIG had an opportunity to inspect, service and work on the gun;

vii.    By negligently failing to place a warning about how mere "vibration" of the gun

could cause it to discharge without a voluntary trigger pull in an adequate manner, which could

be easily understood by a consumer, instead of relying on changing the bottom of page 25 of

the user manual for the gun after several incidents of accidental discharges;

viii.    Other negligent acts and omissions to be developed in the course of discovery.

63.    SIG knew, or should have known, that exposing users to the dangerous and

defective and hazardous conditions existing in the gun would or could give rise to serious bodily

injuries to such users, up to and including death.

64.    The gun's defective condition was latent and Vadnais was not capable of

realizing the dangerous condition, and could not have discovered the dangerous

condition even upon performing a reasonable inspection of the same.

65.    SIG's negligence as alleged in this Count directly and proximately caused the

February 7, 2018 accidental discharge and Vadnais's injuries resulting from the accident.

66.     As a direct and proximate result of the negligence set forth in this Count, Vadnais suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, nursing, attendant care and life care expenses for her care and treatment, and the insertion of a steel rod in her right leg for the rest of her life. These injuries are either permanent or continuing in their nature and Vadnais will suffer such losses and impairments in the future.

## COUNT II

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

67.     Vadnais readopts and re-alleges all the preceding paragraphs of this pleading as if fully set forth herein.

68.     At all relevant times, SIG was in the business of marketing, selling, and distributing weapons, including the gun causing Vadnais's injuries.

69.     SIG knew of the ordinary purposes for which the gun was intended and impliedly warranted it to be of merchantable quality, safe, and fit for such purposes (which included "vibrated" and handled while situated within and without a holster) and all other reasonably foreseeable uses.

70.     At all relevant times, Vadnais used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment and implied warranty of SIG.

SIG breached the above-referenced implied warranties as to the gun because, at the time it left SIG's possession, it was not of merchantable quality and was unreasonably dangerous and unfit for the ordinary and reasonably foreseeable purposes for which it was intended and its reasonably foreseeable misuses by virtue of:

       i.     Failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, so as to prevent accidental discharges;

      ii.    Failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products;

     iii.    Failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally as described above;

     iv.    Negligently failing to unambiguously warn purchasers and end users of the gun, including Vadnais, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

      v.    Failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun;

18

vi.     Negligently failing to place a warning about the danger of mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges;

71.     Vadnais, as the end user of the gun, was a person who would foreseeably be injured by breaching the implied warranty referenced in this Count and SIG's breach of the warranty of merchantability as alleged herein directly and proximately cause the accident on February 7, 2018 and Vadnais's claimed injuries.

72.     As a direct and proximate result of the breaches set forth in this Count, Vadnais suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, nursing, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Vadnais will suffer such losses and impairments in the future.

## COUNT III

### BREACH OF WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

73.     Vadnais readopts and re-alleges all the preceding paragraphs of this Complaint as if fully set forth herein.

74.     At all times material hereto, SIG was in the business of marketing, selling, and

distributing weapons, including the gun causing Vadnais's injuries. Upon information and belief, SIG knew or had reason to know the gun would be situated in holsters that would need to be removed from a law enforcement end user's service belt at the time they sold the gun, and that the purchaser was in fact relying on SIG's skill, judgment, and implied warranty of the gun's fitness for that particular purpose without firing.

75.     Accordingly, SIG impliedly warranted that the gun was suitable for the particular purpose of being situated within a holster that would need to be removed from service belts from time to time.

76.     At all relevant times, Vadnais used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment and implied warranty of SIG in using and handling the gun and its SIG-issued holster.

77.     SIG breached the above-referenced implied warranty as to the gun in that it was unreasonably dangerous and unfit to be removed while in its holster at the time it left SIG's possession by virtue of:

i.      Failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, so as to prevent accidental discharges;

ii.     Failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products;

iii.    Failing to make reasonable tests and/or inspections to discover the defective,

20

hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally as described above;

iv.    Negligently failing to unambiguously and conspicuously warn purchasers and end users of the gun, including Vadnais, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

v.    Failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun;

vi.    Negligently failing to place a warning about the danger of mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges.

78.    As a direct and proximate result of the breaches set forth in this Count, Vadnais suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, nursing, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Vadnais will suffer such losses and impairments in the future.

## COUNT IV

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

79.     Vadnais readopts and re-alleges all the preceding paragraphs of this Complaint as if fully set forth herein.

78.     By its actions, SIG knew, or should have known, that the design and/or manufacturing defect in the gun rendered it capable of discharging without the trigger being pulled.  Yet is presented to the Loudoun County Sheriff's Department including Vadnais, and the general public, in marketing materials that numerous safeties would prevent the gun from firing unless the trigger was pulled.

79.     SIG's conduct created an unreasonable risk of causing the plaintiff emotional distress;

80.     Vadnais's emotional distress was foreseeable;

81.     The emotional distress was severe enough that it might result in illness or bodily harm, and in fact did result in severe bodily harm; including severe damage to her right femur, blood loss, and the scattering of shrapnel from the discharged round within her leg which will remain in her leg for at least another year and possibly indefinitely if the fragments cannot be removed safely surgically.

82.     SIG's conduct was the direct and proximate cause of Vadnais's distress.

83.     The trigger was not pulled by Vadnais, yet the weapon still fired and shot her in the leg, breaking her femur in half and narrowly missing her femoral artery, which would have

22

been a mortal injury.

84.     As a direct and proximate result of the breaches set forth in this Count, Vadnais suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, nursing, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Vadnais will suffer such losses and impairments in the future.

## COUNT V

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

85.     Vadnais readopts and re-alleges all the preceding paragraphs of this Complaint as if fully set forth herein.

86.     Upon information and belief, SIG had knowledge of the various defects with the commercial version of the P320 gun more than a year before Vadnais was shot in February 2018.

87.     Despite having such knowledge, it failed to issue a mandatory recall of the gun despite the ability to do so, which would have prevented the severe injury to Vadnais.

88.     Had SIG acted responsibly and repaired the defects in the commercial version of the P320 before February 2018, Vadnais never would have been shot. The round discharged from her weapon easily could have taken her life.

89.     SIG knew, or should have known, that severe emotional distress was a likely result of its outrageous and irresponsible conduct, which was designed to save in excess of $100 million in repair costs, by implementing a "voluntary upgrade" of the gun instead of a mandatory recall.

90.     SIG's conduct in this matter was self-serving, deceptive, reckless, intolerable and outrageous as described above, such as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community.

91.     SIG's conduct was the direct and proximate cause of Vadnais's distress.

92     The emotional distress sustained by Vadnais was severe, and was accompanied by severe and permanent physical injury.

93.     As a direct and proximate result of the breaches set forth in this Count, Vadnais suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, nursing, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Vadnais will suffer such losses and impairments in the future.

## COUNT VI

## VIOLATION OF THE CONSUMER PROTECTION ACT Va. Code Ann. § 59.1-200(5)(6) and (14)

94.     Vadnais readopts and re-alleges all the preceding paragraphs of this Complaint

as if fully set forth herein.

95.     By it actions, SIG has violated subsections (5), (6) and (14) of the Consumer Protection Act.

96.     Specifically, subjection (5) of the Act prohibits "[m]isrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits.

97.     Subsection (6) prohibits "[m]isrepresenting that goods or services are of a particular standard, quality, grade, style, or model.

98.     Subsection (14) prohibits "[u]sing any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

99.     SIG has violated each of these provisions by expressly and simultaneously representing:

      (i)     that the P320 gun will not fire unless the trigger is pulled;

      (ii)     that the gun may fire if "vibrated" without the trigger being pulled;

      (iii)     that "[f]rom the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to", while knowing that it has fired many times without voluntary trigger pulls;

      (v)     that the commercial version of the gun is safe in its original design and manufacture, but may be made "better" by means of a "voluntary upgrade", when it is in fact not merely of lesser quality, but is in fact unsafe, and susceptible to accidental discharges without voluntary trigger pulls, without several repairs being made to it;

    (vi)    that the gun may fire if it is dropped with a chambered round; and

    (vii)   that the gun is also, at the same time, "drop safe."

    101.    SIG contracted with the Loudoun County Sheriff's Department clearly and definitely intending to confer a benefit upon Vadnais, i.e., the provision of a duty weapon.

    102.    As a direct and proximate result of the statutory violations set forth in this Count, Vadnais suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, nursing, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Vadnais will suffer such losses and impairments in the future.

## PRAYER FOR RELIEF

    **WHEREFORE**, as compensation for injuries suffered due to SIG's negligence and breaches of its implied and express warranties of merchantability and fitness for a particular purpose, deceptive marketing practices, and negligent and intentional infliction of emotional distress and physical injury, Vadnais demands judgment in her favor and against SIG in the amount of TEN MILLION and 00/100 DOLLARS ($10,000,000.00) together with pre-judgment interest from February 7, 2018, attorneys' fees, and costs.

**A  JURY TRIAL IS REQUESTED.**

PLAINTIFF
MARCIE D. VADNAIS

By:

__/s/Jeffrey S. Bagnell_____
Jeffrey S. Bagnell
Federal Bar No. CT18983
Jeffrey S. Bagnell, Esq., LLC
55 Greens Farms Road, #200-60
Westport, Connecticut 06880
(203) 984-8820
(203) 255-4454 (fax)
jeff@bagnell-law.com

Counsel for Plaintiff

(Pro Hac Vice Admission Pending)

By:              /s/ Corey R. Pollard
Corey R. Pollard
VSB No. 78931
Jenkins, Block, & Associates P.C.
1111 East Main St., Suite 803
Richmond, VA 23219
Tel: 804.788.4311
Email: corey_pollard@teamjba.com

Counsel for Plaintiff