1

1     UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF VIRGINIA
2           ALEXANDRIA DIVISION

3   MARCIE D. VADNAIS,              )   Case 1:18-cv-00540
                                    )
4              Plaintiff,           )
                                    )
5        v.                         )   Alexandria, Virginia
                                    )   May 28, 2019
6   SIG SAUER, INC.,                )   2:03 p.m.
                                    )
7              Defendant.           )   Day 1 (PM Session)
                                    )   Pages 1 - 134
8

9              TRANSCRIPT OF TRIAL

10      BEFORE THE HONORABLE LEONIE M. BRINKEMA

11       UNITED STATES DISTRICT COURT JUDGE

12                 AND A JURY

13

14

15

16

17

18

19

20

21

22

23

24

25     COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1   APPEARANCES:

2   FOR THE PLAINTIFF:

3        JEFFREY S. BAGNELL, ESQUIRE, *PRO HAC VICE*
         JEFFREY S. BAGNELL, ESQUIRE, LLC
4        55 Greens Farms Road, #200-60
         Westport, Connecticut   06880
5        (203) 984-8820

6        COREY R. POLLARD, ESQUIRE
         JENKINS, BLOCK & ASSOCIATES, PC
7        1111 East Main Street, Suite 803
         Richmond, Virginia   23219
8        (804) 788-4311

9   FOR THE DEFENDANT:

10       ROBERT L. JOYCE, ESQUIRE, *PRO HAC VICE*
         ROBERT J. KELLY, ESQUIRE, *PRO HAC VICE*
11       LITTLETON PARK JOYCE UGHETTA & KELLY, LLP
         4 Manhattanville Road, Suite 202
12       Purchase, New York   10577
         (914) 417-3400
13
         LAURA MAY HOOE, ESQUIRE
14       MORAN REEVES & CONN, PC
         100 Shockoe Slip, 4th Floor
15       Richmond, Virginia   23219
         (804) 421-6250

16

17

18

19

20

21

22

23

24

25

1                              **I N D E X**

2    <u>WITNESS</u>                      <u>EXAMINATION</u>          <u>PAGE</u>

3    Marcie D. Vadnais                Direct              4
                                      Cross               76
4                                     Redirect            93

5    Kristofer Vadnais                Direct              104

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M. Vadnais - Direct

1          THE COURT:  All right.  Are you ready for the

2    first witness?

3          MR. BAGNELL:  Yes, Your Honor.

4          THE COURT:  All right.  Go ahead.

5          MR. BAGNELL:  Your Honor, I call Plaintiff

6    Marcie D. Vadnais.

7          THE COURT:  All right.

8          Ms. Vadnais, you don't need to stand.  You

9    are going to take the affirmation right now.

10       MARCIE D. VADNAIS, ON HER OWN BEHALF, AFFIRMED

11                    DIRECT EXAMINATION

12   BY MR. BAGNELL:

13   Q    Marcie, good afternoon.

14        I want to start off with some preliminary

15   questions largely based in part --

16          THE COURT:  Just a second.

17          For the record, would you please state your

18   full name.

19          THE WITNESS:  It is Marcie Dean (phonetic)

20   Vadnais.

21          THE COURT:  Go ahead.

22          MR. BAGNELL:  Thank you, Your Honor.

23   BY MR. BAGNELL:

24   Q    I want to start off with a couple of preliminary

25   questions, Marcie, based largely on Mr. Joyce's

M. Vadnais - Direct

1  statements during his opening statement.  Mr. Joyce

2  announced that your wound basically has healed.  Is

3  that accurate?

4  A    No, sir.

5  Q    All right.  What do you base your understanding

6  that it is not accurate on?

7  A    My last doctor's appointment, and I am nowhere

8  close to being what I was before.

9  Q    Do you still have a titanium rod in your leg?

10 A    Yes.

11 Q    Is that inside your broken femur bones?

12 A    Yes.

13 Q    How is that connected to your body?

14 A    There's a -- basically, a bolt that goes into my

15 hip that attaches it there, and then there are two

16 screws that attach it at my knee.  It's -- they

17 basically go in and hollow out my femur to put the rod

18 in through the middle and then attach it with those two

19 devices.

20 Q    We'll go through the surgeries.

21      But Mr. Joyce used the word "union," I believe.

22 Has any doctor told you that your femur is reunified at

23 this point?

24          MR. KELLY:  Objection.

25          THE COURT:  The question is simply if the

M. Vadnais - Direct

1  doctor has told the witness that.  I'll overrule the

2  objection.

3  A    Yes.

4  Q    What is your understanding -- I know you're not a

5  physician, Marcie, but what's your understanding of the

6  status of your femur at this point?

7  A    It's still healing, still fusing the bone back

8  together, and as of right now, there's what he calls a

9  malunion.

10  Q    Do you still have pain with your leg?

11  A    Extreme.

12  Q    And how does that manifest itself during the days

13  and nights?

14  A    It's there constantly.  It's always there.

15  Sleeping is affected.  Walking is extremely affected,

16  driving, sitting.  Anything I do from hip to knee, I

17  have issues.

18  Q    All right.  Is your leg in any way the way it was

19  before this gunshot wound?

20  A    No.

21  Q    We had some technical difficulties in our opening

22  which we've since fixed.  Mr. Joyce showed you an

23  animation.  Do you recall that?

24  A    Yes.

25  Q    I want to show the jury and you our animation of

M. Vadnais - Direct

1  what happened, and then we'll talk about it a little

2  bit.

3        (A video is played.)

4  BY MR. BAGNELL:

5  Q    All right.  Marcie, I know that's disturbing to

6  watch, but is that what happened that morning in

7  February?

8  A    As close as an animation --

9            MR. KELLY:  Objection.

10            THE COURT:  The basis for the objection?

11            MR. KELLY:  There's no scientific or

12  technical foundation for asking this witness about the

13  technical events that occurred that morning.

14            THE COURT:  Well, the question may have been

15  inarticulate, but all he's asking this witness to do is

16  to look at this reconstruction and say whether or not

17  in her memory of the event that's how it happened.  So

18  I'm overruling the objection.

19            But we need to have -- this doesn't show up

20  in any kind of a meaningful record.  You need to ask

21  the witness questions.

22            MR. BAGNELL:  I will, Your Honor.  I

23  understand.  I just wanted to counter since we weren't

24  able to show that.

25            THE COURT:  No.

1          MR. BAGNELL:  Okay.

2          THE COURT:  I'm sorry.  If you're not going

3   to use it, it goes off the screen.

4          MR. BAGNELL:  Oh, I'm sorry.

5          THE COURT:  Your colleague is going to have

6   to help you because I can't have you running back and

7   forth throughout the trial.

8   BY MR. BAGNELL:

9   Q    Okay.  Marcie, can you tell the jury -- first of

10  all, where were you educated?

11  A    As far as high school?

12  Q    Say, college.

13  A    I did a couple of different online colleges.

14  Since I was home with my kids at the time, I just did

15  online college.

16  Q    How many children do you have?

17  A    I have -- I say three and a half.  I have a

18  stepdaughter.  So I consider her -- so technically

19  four.

20  Q    Are you married?

21  A    Yes.

22  Q    How long have you been married?

23  A    Eighteen-and-a-half years.

24  Q    When did you first develop an interest in law

25  enforcement?

M. Vadnais - Direct

1  A     I've always had an interest in law enforcement.   I

2  didn't get into it until later on because I was raising

3  my kids first.

4  Q     At some point, did you apply to the Loudoun County

5  Sheriff's Office?

6  A     Yes.

7  Q     When was that?

8  A     In 2010.

9  Q     And what was the position?

10  A     I started out as a records clerk in a civilian

11  position at the jail.

12  Q     And did you apply at some point to become a

13  deputy?

14  A     Yes.

15  Q     Can you explain to the jury how that process

16  worked?

17  A     After working there for about a year, I became

18  pretty close friends with the commanding staff at the

19  jail.  They convinced me to switch over to being sworn

20  since they knew that I was interested in that side of

21  law enforcement.  So in 2012, I went back through

22  the -- I had to go through the whole hiring process all

23  over again, new background, new polygraph, new psych

24  eval, all of that while continuing my job as a records

25  clerk.  And once I was accepted, then I went through

M. Vadnais - Direct

1   the academy and then worked in the jail for about

2   two-and-a-half, three years.

3   Q    When you say "the academy," did you go to an

4   academy at some point?

5   A    Yes.  I went to the Northern Virginia Criminal

6   Justice Academy in 2012.

7   Q    And can you describe or tell the jury what that

8   training involved there?

9   A    Six months of various law enforcement skills

10  between patrol, civil process, effect an arrest,

11  high-risk traffic stops, directing traffic, writing

12  tickets, testifying in court.  Just about anything that

13  you can imagine that you would do as a law enforcement

14  officer, you were trained and did practicals for and

15  tested on through that six months in the academy.

16  Q    And you graduated?

17  A    Yes.

18  Q    When was that, approximately?

19  A    The end of 2012.

20  Q    When you graduated, did you then become a deputy

21  sheriff, or was there additional training after that?

22  Can you explain that?

23  A    Once I'm hired by the sheriff's office, I'm

24  technically -- at that point, I get sworn in even

25  before I go through the academy.  So even through the

M. Vadnais - Direct

1  academy, I was still considered at that point a deputy

2  sheriff.

3      Once I got out of the academy and graduated, then

4  there is three months of on-site training.  So I'm

5  assigned to another deputy that's been there and has

6  training, and then they walk me through the steps of

7  learning the day-to-day dealings of working in the

8  jail.

9  Q    Okay.  With specific regard to firearms, Marcie,

10 can you explain to the jury what your firearms

11 training -- or what firearms training you received at

12 the academy and any before or after that?

13 A    We're issued our weapons prior to going to the

14 academy, and we have to qualify on those weapons before

15 they are issued to us.  So we go out to the range -- I

16 believe it's -- I don't remember exactly how long the

17 initial range date time was.  But once we qualify

18 successfully on our weapons, they're issued to us, and

19 then we just can't carry them until we graduate from

20 the economy.

21     In the academy, they do what's called a breakout

22 period where half of the class goes to the range for a

23 week, and half the class goes to driving school for a

24 week.  Then they flip-flop after that.  So I spent a

25 week at the range learning everything from the

M. Vadnais - Direct

1  nomenclature of our handguns and shotguns and going

2  through courses of fire pretty much every single day.

3  Q    What kind of weapons did you receive training in?

4  A    Well, we were at the range during the academy.  We

5  trained on our own -- whatever our agency issued.

6  There are several agencies that use that academy.  At

7  that time, I was trained on the H&K USP and the

8  shotgun 870, Remington 870.

9  Q    Did you qualify on the agency-issued firearms that

10 you were working with?

11 A    Yes.

12 Q    Did you ever receive any discipline for any

13 improper use of firearms?

14 A    No.

15 Q    Any type of criticism for failing to deploy a

16 weapon out of holster correctly?

17 A    No.

18 Q    At some point, Marcie -- let me ask you about your

19 performance record at LCSO.  Did you ever get any

20 substandard performance reviews during your tenure at

21 LCSO before the incident that occurred in February

22 2018?

23 A    No.

24 Q    Did you receive commendations?

25 A    Yes.

M. Vadnais - Direct

1  Q    Can you tell the jury what kind of commendations

2  you received?

3  A    I can try and remember what they were.  There was

4  a couple of bronze awards, which are mostly just a

5  write-up that goes in your file of something that

6  somebody noticed that you did that was above what's

7  expected, and that usually follows on with a bonus of

8  like $250 or $500, something.

9        I received a valor award, which is a lifesaving

10 award.  I got the commendation awards.  I know there's

11 been several awards that were given out, but I don't

12 remember the specifics of each one of them.

13 Q    I don't know if you mentioned Project Lifesaver,

14 something about lifesaving.

15 A    Project Lifesaver is a separate program.  The

16 valor award that I received was a lifesaving award.  I

17 found an inmate hanging in his cell and was able to get

18 him down and resuscitate him and brought him back.  I

19 received a lifesaving award for that.

20 Q    You received a letter from Senator Warner

21 commending you at one point; is that correct?

22 A    I believe so.  It was one of the letters.  Not all

23 of the awards that they hand out are made like a big

24 deal.  They usually are like, Oh, hey, we put you in

25 for this.  It was granted that you are going to have a

M. Vadnais - Direct

1  bonus in your next paycheck.

2      So the valor award is the one that sticks out the

3  most.  They make it -- that is a big deal, a big

4  luncheon.  A lot of people are there.  The sheriff is

5  there.  It's quite a big ordeal.

6          MR. BAGNELL:  Your Honor, I'd like to offer

7  plaintiff's personnel file into evidence at this time.

8          THE COURT:  What's the exhibit number?

9          MR. BAGNELL:  It's 26.

10          THE COURT:  Is there any objection?

11          MR. KELLY:  Can I see the exhibit, please,

12  Your Honor?

13      (Mr. Bagnell hands Mr. Kelly an exhibit.)

14          THE COURT:  Is there any objection?

15          MR. KELLY:  Your Honor, I don't know if it's

16  a complete file.  If it's being offered as a complete

17  file, I have no objection.

18          THE COURT:  Well, whether it's complete or

19  not, this is the portion of her file that you want

20  introduced?

21          MR. BAGNELL:  Yes, Your Honor.

22          THE COURT:  I'm allowing it in.  Exhibit 26

23  is in.

24          MR. BAGNELL:  May I hand it to the witness,

25  Your Honor?

M. Vadnais - Direct

1        THE COURT:  No.  In court, everything goes

2   through the court security officer.

3        MR. BAGNELL:  Oh, I'm sorry.

4   BY MR. BAGNELL:

5   Q    If you will, just flip through that, Marcie, for a

6   few seconds.

7        THE COURT:  You need to ask a specific

8   question.  What's your question?

9   BY MR. BAGNELL:

10  Q    Marcie, have you seen your personnel file before?

11  A    Yes, briefly.

12  Q    Okay.  Do the documents in here look familiar to

13  you?

14  A    Some of them, yes.

15  Q    The commendations and awards that are in there?

16  A    Yes.

17  Q    Your firearms training certificates are in there

18  as well?

19  A    Correct.

20  Q    I want to talk to you now, Marcie, about when your

21  department switched over from the HK 330, I believe, to

22  the SIG Sauer P320.

23  A    Yes.

24  Q    Do you recall when that happened?

25  A    I believe it was the fall qualifications of 2016.

M. Vadnais - Direct

1   Q     Was there any explanation given to you why it was

2   being changed from Heckler & Koch to SIG Sauer?

3   A     I believe it was just that the parts for H&K were

4   getting hard to find.

5   Q     Who issued you the SIG Sauer P320 that you

6   eventually carried on duty?

7   A     I don't recall who the range master at the time

8   was, but it would have been the range master.  There's

9   been a change.  There's been two or three since then.

10  So I don't remember who was the range master then.

11  Q     Did he give you a gun box?

12  A     Yes.

13  Q     And what did it contain?

14  A     The weapon, three magazines, a gunlock, and a

15  small pamphlet of basic instructions of the weapon,

16  functions of the weapon, and two other things that were

17  basically -- mostly advertisements.

18  Q     Did it come with a holster in the box?

19  A     Yes.

20  Q     And was it a P250 holster?

21  A     Yes.

22  Q     The gun was a P320; is that correct?

23  A     Correct.

24        MR. BAGNELL:  Your Honor, I'd like to offer

25  Defendant's Exhibit 25 which is an examplar SIG Sauer

M. Vadnais - Direct

1  P250 holster.  I believe because there was no

2  objection, Your Honor, it's already a full exhibit.

3          THE COURT:  You still have to formally move

4  them in.

5          MR. BAGNELL:  All right.

6          THE COURT:  So 25.

7          Again, one of the problems we have here is

8  the way you've done your exhibits.  Exhibit 25 is a

9  thick exhibit.  It goes from Bates No. 1 to, I think,

10  112.  So what pages are you talking about here?

11          MR. BAGNELL:  Well, I wanted to move in the

12  holster, Your Honor.  I just wanted to have her

13  personnel file in as evidence, specifically regarding

14  the commendations and awards.

15          THE COURT:  No.  No.  But 25 in my book --

16  Exhibit 26 is the personnel file.  That's in evidence.

17  Exhibit 25, at least in the book you gave me, is full

18  of photographs.

19          The Defendant's 25 or the Plaintiff's 25?

20          MR. BAGNELL:  Your Honor, both of us have

21  that large exhibit.  Those are the documents that

22  Loudoun County supplied to us, the photographs of the

23  scene, and we both grouped them as one large exhibit

24  because they came at the same time from Loudoun County.

25          THE COURT:  What exhibit right now do you

M. Vadnais - Direct

1  want to show to the witness?

2           MR. BAGNELL:  The examplar P250 holster.

3           THE COURT:  You want the physical holster

4  itself, not the photographs?

5           MR. BAGNELL:  An examplar.  We have a sample.

6           THE COURT:  All right.  So it's not in the

7  book?

8           MR. BAGNELL:  No.

9           THE WITNESS:  It's in my chair.

10          MR. BAGNELL:  This is it, Your Honor.  I

11 identify this as Defendant's Exhibit 25.  It's an

12 exemplar of the holster that Marcie was carrying that

13 day.

14          THE COURT:  Mr. Kelly?

15          MR. KELLY:  No objection, Your Honor.

16          THE COURT:  All right.  Well, we need to put

17 a sticker on it.  Then that's Defense Exhibit 25?

18          MR. BAGNELL:  That's correct, Your Honor.

19          THE COURT:  All right.  Ask your question.

20 BY MR. BAGNELL:

21 Q    Did you recognize that holster, Marcie?

22 A    Yes.

23 Q    Is that the holster you had on your waist that

24 morning, February 7, 2018?

25 A    Yes.

M. Vadnais - Direct

1   Q    Is that -- that's the holster that was issued with

2   the P320 gun?

3   A    Yes.

4   Q    It's not a P320 holster?

5   A    No.

6         MR. BAGNELL:  Your Honor, I'd like now to

7   offer into evidence the subject pistol, Defendant's

8   Exhibit 20, the actual pistol that Marcie was carrying

9   that morning.

10        THE COURT:  I assume there's no objection,

11  Mr. Kelly.

12        MR. KELLY:  I would like to see it, Your

13  Honor.  I don't think I'll have an objection.

14        THE COURT SECURITY OFFICER:  It's still

15  sealed and unopen, Your Honor.

16        THE COURT:  All right.  We need to open it.

17  Bring it up here.

18        Ladies and gentlemen, the practice in the

19  court with any firearms in any kind of a case is we'll

20  have it shown to you.  At any point when you are

21  deliberating, if you want to have a chance to see it

22  again, you will be able to do that.  We do not give

23  firearms.  We don't give drugs.  We don't give cash.

24  Certain exhibits, you get to see them in court.  We'll

25  have photographs, substitutions, and you can ask them

M. Vadnais - Direct

1   to see them again live, but we don't give them to you

2   without controls.  All right.

3             MR. KELLY:  No objection.

4             THE COURT:  All right.  Defense Exhibit 20 is

5   in evidence.

6             MR. BAGNELL:  Marcie, if you would, just

7   briefly look at the weapon if you can.

8             All right.  You can't.

9             THE COURT:  Well, there's no objection to the

10  exhibit, correct?

11            MR. KELLY:  Correct, Your Honor.

12            THE COURT:  All right.  It's in evidence.

13            MR. BAGNELL:  All right.  Thank you, Your

14  Honor.

15  BY MR. BAGNELL:

16  Q    Now, Marcie, you heard the opening statements.

17  What I'd like you to do -- well, before we go through

18  what happened that morning, when the gun was issued to

19  you, the P320, did the range master tell you anything

20  about it?

21  A    When we were issued the weapons, no.  Like anytime

22  we'd get a new weapon, we would go through the

23  nomenclature of it, how to break it down, how to clean

24  it, how to reassemble it, how to do our function test.

25  Then we'd go out and qualify.

M. Vadnais - Direct

1  Q    All right.  Who was the range master at the time?

2  A    When we were issued those, I don't remember.

3  Q    Were you told anything about the P250 holster?

4  A    No.

5            THE COURT:  Hold on.  Is there an objection

6  or not?

7            MR. KELLY:  Objection, hearsay.

8            THE COURT:  It's being offered for the truth

9  of its contents.  If it was hearsay, it would not come

10  in.  Sustained.

11  BY MR. BAGNELL:

12  Q    All right.  Marcie, I want to go to the morning of

13  February 7 at this point.

14        Before we do that, briefly, were you trained in

15  the P320?

16  A    Yes.

17  Q    Can you describe that training for the judge and

18  jury?

19  A    We qualify twice a year on our weapons.

20  Q    All right.

21  A    One time in the spring is a four-hour day of

22  course of fire going through different drills.  And

23  then in the fall, it's an eight-hour day where we go

24  through the four hours of qualifying and doing the same

25  drills.  And then we will have some other type of

M. Vadnais - Direct

1  scenarios, like building clearing, active shooters.

2  We'll practice at a school.  You know, different --

3  just different scenarios that they would come up with

4  for us to do our additional training with our weapons.

5  Q    Can you estimate how many rounds you fired with

6  your P320 before February 7?

7  A    Thousands.

8  Q    Thousands of rounds?

9  A    Yes.

10 Q    Did you ever accidentally discharge a round out of

11 your P320?

12 A    No.

13 Q    Do you recall what the trigger pull weight of your

14 P320 was?

15 A    I believe we were told it was somewhere between

16 five-and-a-half and seven --

17            MR. KELLY:  Objection.

18            THE COURT:  Wait.  Wait.  Wait.

19            MR. KELLY:  Hearsay, what they were told

20 about the capacity of the weapon.

21            THE COURT:  Sustained.

22 BY MR. BAGNELL:

23 Q    Did you personally know what the trigger weight

24 was, Marcie?

25 A    No.

M. Vadnais - Direct

1   Q    So thousands of rounds you testified you put

2   through this gun?

3   A    Yes.

4   Q    Were you subject to any formal training with it at

5   the range, for example?

6   A    Yes.

7   Q    Can you describe how that process worked?

8   A    It's the same as it would be with any of our other

9   weapons where, you know, drawing drills, going through

10  the course of, you know, fire, which is a 50-round

11  course, firing from behind cover.  Part of the course

12  of fire is laying our weapons down on the asphalt,

13  taking a step back, and then within a certain amount of

14  time having to go up, kneel down, pick up our weapon,

15  and fire it accurately.

16  Q    Did you ever accidentally pull the trigger at any

17  time?

18  A    No.

19  Q    You may have testified to this, Marcie -- I'm not

20  sure -- but did you ever get any discipline for your

21  use of the P320?

22          THE COURT:  That's been asked and answered.

23          MR. BAGNELL:  You're right, Your Honor.

24  BY MR. BAGNELL:

25  Q    The qualifications with the P320, Marcie, can you

M. Vadnais - Direct

1  explain what that means, that you qualified three times

2  with the P320?

3  A    We have a minimum score that we would have to hit

4  the target from during our course of fire, and the

5  minimum score is 175.  If you don't make 175, they will

6  give you remedial training.  And if you don't pass the

7  second time, they actually will take your weapon from

8  you, send you through a whole weeklong course until you

9  qualify to get your weapon back.

10      I have never not qualified on any of the weapons

11  that I have carried with the sheriff's office.

12  Q    Were you ever disciplined for accidentally drawing

13  your weapon at any time?

14  A    No.

15  Q    Did you ever draw your weapon at any time in the

16  line of duty, Marcie?

17  A    I have had to put down deer, but I've never had to

18  draw it particularly at a person.  I have drawn my

19  weapon to do a building clearing if we get a burglar

20  alarm.  There would be different types of calls in the

21  evenings, holding a house where somebody may be armed,

22  situations like that that we would have our weapons out

23  but not actually drawing my firearm down on somebody.

24  Q    Based on your experience as a law enforcement

25  officer, Marcie, is drawing your weapon a use of force?

M. Vadnais - Direct

1    A    It depends on what you're drawing it for.  If I'm

2    drawing it to clear a building, then it's not

3    considered a use of force.  If I draw my weapon and

4    it's actually pointed at somebody, then yes.

5    Q    Again, based on your training and experience, is

6    drawing your weapon what you call a serious event?

7    A    Yes.

8    Q    Is it something you would ever do lightly in other

9    words?

10   A    No.  You better have a really good reason to draw

11   your weapon if you're going to draw.

12            MR. BAGNELL:  Your Honor, before I go into

13   the questioning about the specific morning, I need to

14   get this evidence -- or these exhibits into evidence,

15   the pants, the casings.

16            THE COURT:  Just move them.

17            MR. BAGNELL:  All right.  Your Honor, I would

18   like to move Defense Exhibits --

19            THE COURT:  Defense now or plaintiff's?

20            MR. BAGNELL:  These are designated as defense

21   exhibits, Your Honor.  They are -- the actual physical

22   evidence, they designated it -- Defense Exhibits 21 --

23            THE COURT:  Which is what?  Just for the

24   record, what is 21?

25            MR. BAGNELL:  Twenty-one is the subject

M. Vadnais - Direct

1  holster, the 250 holster.

2          THE COURT:  All right.  Is 21 in the

3  courtroom?  Did the defense bring their exhibits in?

4          MR. KELLY:  I believe, Your Honor, that if

5  it's here, it would have been brought by Loudoun

6  County.

7          THE COURT:  And they're not labeled?

8          MR. KELLY:  They're not labeled.

9          THE COURT:  Ladies and gentlemen, I'm going

10  to give you a little bit of a break.  I don't want you

11  wasting your time on this.  All right.  So if you

12  would, just go back to jury room.  I think we've got

13  more air conditioning back there.  We will get you back

14  in here as soon as we can.

15      (The jury exits at 2:32 p.m.)

16          THE COURT:  All right.  Now, what's going on

17  with these exhibits?  We never have these issues.

18          Ms. Vadnais, you can have a seat.

19      (The witness stands aside.)

20          THE COURT:  Why do we not have these labeled?

21          MR. BAGNELL:  Well, they were -- the defense

22  designated them as exhibits.  I did not object.  And

23  pursuant to your pretrial order, they were full

24  exhibits at that point.  As to why they're not labeled,

25  they were in the possession of the Loudoun County

1   Police Department.

2            THE COURT:  I don't care whose possession

3   they're in.  They're now in a court of law.  And I've

4   got to have exhibit numbers on them, or it makes no

5   sense what they're doing here.  All right.

6            MR. BAGNELL:  I understand, Your Honor.

7            THE COURT:  My court security officer can't

8   be expected to waste time looking through these things.

9   We're going to take a couple of minutes and get some

10  evidence stickers and put them on these exhibits.

11           MR. BAGNELL:  I agree, and I understand.

12           THE COURT:  Now, the only other thing, since

13  we're having a little bit of a break, I expect both

14  sides to be better about how we're doing exhibits.  You

15  can't just in my court put a 120-page exhibit in, the

16  whole personnel file.  I let you do it because I wanted

17  to move this case along, but I expect you to go through

18  that file and just keep in there what are relevant to

19  your case.  There's all sorts of stuff in there that I

20  don't think has anything to do with this case.  So I

21  want to make sure that on future days we don't have

22  this problem.

23           The second thing is there are two attorneys

24  representing the plaintiff.  There's no reason why your

25  cocounsel is not back there running the machine.  I

1  cannot have you running back and forth from the lectern

2  to the machine.  All right.  You should have worked it

3  out with our audio-visual person in advance if you

4  needed cables or something.  In any case, certainly,

5  starting tomorrow I expect things to be tightened up.

6          MR. BAGNELL:  I understand, Your Honor.

7          THE COURT:  All right.  Are there any other

8  issues we're going to have along this evidence line?

9          MR. KELLY:  Yes, Your Honor.  These exhibits

10  are being offered -- they're being offered and placed

11  into evidence --

12          THE COURT REPORTER:  I'm sorry, sir?

13          THE COURT:  Come to the lectern, please.

14          MR. KELLY:  I've been asked several times now

15  to agree to the admission into evidence of exhibits for

16  which there has been no testimonial foundation.  In

17  several instances, the exhibits haven't even been

18  shown, much less labeled.  And, you know, I'm familiar

19  in general terms with what's being offered.  It's going

20  to be a holster.  If it's the same holster I think it

21  is, then I don't have an objection.  But I need to see

22  it.  I think the appropriate way for counsel to do that

23  is to lay a foundation through testimony.  That would

24  also avoid opinion testimony and other forms of things

25  that are maybe objectionable.

1          THE COURT:  Right.  The normal way it's done

2    is the exhibit would be shown to the witness:  Do you

3    recognize this?  Is this the holster that you had?  And

4    does this look like the holster?  Yes.  Then you can

5    move it in.

6          MR. KELLY:  Right.

7          THE COURT:  All right.  Any of these items

8    that are in the box that don't apparently have labels

9    on them, they need to get properly labeled.  Then we

10   need to have this case start to go in a much more

11   tailored fashion than it is right now.  I don't want

12   objections to every single exhibit.  So I expect you

13   all to work this out.  I'm going to give you a

14   ten-minute break to get this done.

15      (Recess from 2:35 p.m. until 2:48 p.m.)

16      (The jury is not present.)

17         THE COURT:  I think we should close the

18   blinds for the afternoon.  I don't want the jury to

19   have their sight blocked.

20         Are we all set now with these exhibits?

21         MR. BAGNELL:  Yes, Your Honor.

22         THE COURT:  There are not going to be any

23   more exhibit problems, right?

24         MR. BAGNELL:  No, Your Honor.  I'll do my

25   best.

1          THE COURT:  Is Mr. Pollard going to be able

2   to run the equipment for you?

3          MR. BAGNELL:  The problem, Your Honor, is

4   that my MacBook is -- the password jumps up every

5   time -- I'll give him the password, but I can work with

6   him to have him -- that was the problem.  I was

7   entering the password to bring up all the information.

8          THE COURT:  All right.  You need to work

9   together on that.

10          All right.  Let's bring the jury in.

11          THE COURT SECURITY OFFICER:  Yes, Judge.

12      (The jury enters at 2:48 p.m.)

13          THE COURT:  Folks, has it cooled down in the

14   jury room a little bit, or is it still stuffy in there?

15          A JUROR:  It's okay.

16          THE COURT:  It's okay.

17          All right.  You may have a seat.

18          I think we have worked out the labeling of

19   these exhibits.  Now we can proceed.

20          MR. BAGNELL:  Thank you, Your Honor.

21                  FURTHER DIRECT EXAMINATION

22   BY MR. BAGNELL:

23   Q   Marcie, before we broke, we were talking about,

24   essentially, your qualifying on the P320.  Do you

25   recall that?

M. Vadnais - Direct

1    A    Yes.

2    Q    Do you recall the last time you qualified on the

3    P320 before the February 7 incident?

4    A    Middle of January that year, 2018.

5    Q    So is that a couple of weeks before the incident?

6    A    Yes.

7    Q    And qualifying, again, involved shooting how many

8    rounds through it?

9    A    We run a 50-round course.

10   Q    And a course, is that different from just standing

11   at a range and firing?

12   A    Yes.

13   Q    Are you moving around?

14   A    Yes.

15   Q    How so again?

16   A    We start at 25 yards.  We move to 15, up to the 7,

17   to 5, and just different distances from our target

18   drawing and firing two rounds in three seconds,

19   different types of, you know -- different things to

20   manipulate what we're doing to where we're prepared in

21   any situation.

22   Q    Did you ever have any problems handling the P320?

23   A    No.

24   Q    Was it too heavy for you?

25   A    No.

M. Vadnais - Direct

1 Q     Did you find it unwieldily in any way?

2 A     No.

3 Q     Can you tell the jury what led you to attend this

4 course that Saturday morning at the Criminal Justice

5 Academy?

6 A     You mean on that Wednesday?

7 Q     The Wednesday.

8 A     Yes.  It was a Monday-through-Friday course that I

9 was taking.  It's general instructor, and I was

10 attending this class to get my certification so that I

11 could go on and teach other courses within the

12 sheriff's office, to be an instructor basically.

13 Q     Did Loudoun County Sheriff's Office require you to

14 take this course?

15 A     It is not required, but in order for me to do any

16 teaching, then I have to have that certification.  It

17 is required by the state.

18 Q     February 7, 2018, was a Saturday morning; is that

19 correct?

20 A     No.  It was a Wednesday.

21 Q     It was a Wednesday morning?

22 A     Yes.

23 Q     Okay.  Can you describe what you did that morning?

24 A     From waking up or arriving at the academy?

25 Q     Just waking up -- when you woke up to arriving at

M. Vadnais - Direct

1  the academy.

2  A     Okay.  I woke up that morning around 4:15,

3  4:30-ish, got ready, left my house about -- between

4  5:00 and 5:15.  It takes me about an hour, hour and 20

5  minutes or so to get to the academy because I have to

6  stop and drop my personal vehicle off halfway and pick

7  up my cruiser.  So I left the house, stopped at the gas

8  station by my house to get my coffee that I get every

9  morning, and then continued on over the mountain to

10 Round Hill where our most western station is where I

11 park my cruiser at the county line, basically.  I

12 switched over vehicles, continued on from there to the

13 academy that's at Ashburn, which is another 30- to

14 40-minute drive depending on the traffic that day.

15 Q     What were the weather conditions that morning?

16 A     By my house, it was rain and sleet.  I know

17 because I remember my kids had no school that day

18 because of the icy roads.  And when I got to my

19 cruiser, I had to scrape the ice off of the windshield

20 of my cruiser.

21 Q     What time did you arrive at the academy?

22 A     I want to say it was around 6:40-ish.

23 Q     All right.  And were you carrying your

24 department-issued P320 at the time?

25 A     Yes.

M. Vadnais - Direct

1  Q     And was there a round in the chamber?

2  A     Yes.

3  Q     Can you explain to the jury why you had a round in

4  the chamber?

5  A     That's how we are trained, to have a fully loaded

6  weapon.   The magazine holds 17.   So we train to fully

7  load our magazine, rack to slide, drop our magazine,

8  and load one more round into it.   So we carry 18 rounds

9  in our firearms.   So we are always at the ready with

10 our weapons.

11 Q     What is the advantage to having a chambered round

12 as a law enforcement officer?

13 A     As law enforcement, you don't always have time to

14 rack a slide if you are in a situation where you're

15 going to need to draw your weapon and fire it.

16 Q     Do all deputy sheriffs at LCSO carry with a

17 chambered round to your knowledge?

18 A     We are trained to.

19 Q     Who does that training?

20 A     We learn that at the academy and then at the range

21 when we go.   That's something that, you know -- we load

22 our weapons, and then everybody is told to rack it and

23 top off.

24 Q     In other words, is it fair to say that it's not a

25 violation of any Loudoun County policy for you to carry

M. Vadnais - Direct

1  a chambered round?  Is that fair to say?

2  A    Absolutely.

3  Q    All right.  Going back to that Wednesday morning,

4  you arrived in the parking lot you said?

5  A    Yes.

6  Q    Approximately what time was it?

7  A    Around 6:40-ish.  I don't remember exactly, 6:40,

8  6:45.

9  Q    Sorry.

10     Can you take the judge and jury through what

11  happened next, what you did then?

12  A    I pulled into the parking lot of the academy.

13  There's three rows of parking.  I pulled into the

14  middle row.  I always back my cruiser in.  So I got to

15  a spot, backed my cruiser in, popped my trunk, and put

16  my car in park and was preparing to remove my holstered

17  weapon to store it in the trunk of my vehicle.

18  Q    What were you wearing that day?

19  A    I had khaki 5.11 tactical pants, a nylon belt.  I

20  had an agency-issued polo shirt on, a hoodie

21  sweatshirt, and then a rain jacket type thing over the

22  top of that.

23  Q    Now, was there a requirement, Marcie, that you

24  remove your holstered weapon before you went into the

25  academy?

M. Vadnais - Direct

1    A    It's not a requirement that you remove it prior to

2    going into the academy, but you can't carry it in the

3    academy.  So, you know, that's -- common practice for

4    me is just you can't have them in there anyways.  So I

5    always store my weapon in my trunk.

6    Q    When you say you couldn't carry it inside the

7    academy, does that mean once you're in the door?

8    A    Yes.  Instructors are pretty much the only ones

9    that are permitted to have a live weapon inside the

10   academy.

11   Q    Who told you that?

12   A    We learned that during the academy.  We all go

13   through the academy with blue Lindell guns that are,

14   basically, plastic weapons.  If we do in-service

15   classes at the academy, we're not permitted to carry

16   our firearms in the academy.

17   Q    Your impression in the car was that you could not

18   enter that facility without disarming; is that correct?

19   A    Correct.

20   Q    All right.  I'd like now to take you through the

21   judge and jury -- to take the judge and jury through

22   your removing of the holstered weapon that morning.

23   A    So sitting in my car, my holster sits on my right

24   hip.  And it was still fairly dark out.  The sun was

25   just starting to come up barely.  So I had moved my

M. Vadnais - Direct

1   holster towards the front of my belt so it was closer

2   to the front of me.  I had my left hand on my belt, my

3   right hand around the biggest portion of the holster,

4   and --

5   Q    Marcie --

6           MR. BAGNELL:  Your Honor, so the jury can

7   see -- can I ask the witness to stand so the jury can

8   see her movements?

9           THE COURT:  All right.  Stand up if you can.

10          Can the jurors see the witness clearly?

11      (All answer affirmatively.)

12          THE WITNESS:  I have a holster.  Do you want

13  me to use that?

14          THE COURT:  Yes.  Go ahead.

15          THE WITNESS:  Okay.

16  BY MR. BAGNELL:

17  Q    Just from how when you -- when you arrived,

18  Marcie, stopped the car, and you can just take us

19  through that.

20  A    Okay.  From here, this is where I would carry my

21  holster.  So once I was there, I moved it forward on

22  the belt to where I could see it and would be pulling

23  it down this way so that I can get my belt through the

24  teeth, as I call them, on the holster.  It's a paddle

25  holster.  So it's intended to where you can slide it on

M. Vadnais - Direct

1    and off.  But, obviously, it's not easily done.  So

2    that way if I was to draw my weapon, the entire thing

3    is not going to come with it.

4        Obviously, it's a little bit different because I

5    had different pants on that day, and belt loops are in

6    different places.  But the majority of it is here, and

7    my hands on my belt slid it forward so I can see the

8    teeth and was moving it in this way.

9    Q    And it discharged?

10   A    Yes.

11   Q    All right.  What do you remember about that event,

12   the specific discharge of the weapon?

13               THE COURT:  Go ahead and have a seat now.

14   A    Okay.  I only realized that it had gone off

15   because I could smell the gunpowder and the smell of

16   like -- I would say like -- the first smell that hits

17   you.  It's almost like a burning hair smell, but it was

18   like burning bloodish.  I don't know how to exactly

19   describe the smell.  And then I was looking down at

20   that angle, and then that's when I saw the blood,

21   realized that my weapon had discharged.

22   Q    Okay.  Did you hear the weapon discharge?

23   A    No.

24   Q    Can you think of why you didn't hear it discharge?

25               MR. KELLY:  Objection.

M. Vadnais - Direct

1  A    No.

2          THE COURT:  Wait.  Wait.  She can describe

3  what was going on.  Overruled.

4  BY MR. BAGNELL:

5  Q    Did you ever draw your weapon that morning,

6  Marcie?

7  A    Absolutely not.

8  Q    Did you ever pull the trigger?

9  A    Absolutely not.

10  Q    Did you ever touch the trigger?

11  A    Absolutely not.

12  Q    This animation that SIG Sauer played where you

13  allegedly -- in one motion, you move your hand up the

14  holster, draw the gun, find the trigger, pull it, did

15  that ever happen that morning?

16  A    No.

17  Q    Okay.  Marcie, now that you have been shot, can

18  you describe the events after that?  First of all,

19  starting with whatever kind of pain you experienced and

20  however long it took for you to realize and then what

21  happened after that, can you take the judge and jury

22  through that?

23  A    Once I realized what had happened and that all of

24  my windows were intact, so it had to have been my

25  weapon that fired, I opened my door, my driver's side

M. Vadnais - Direct

1  door, and hit my horn on my steering wheel because it

2  activates my sirens trying to get attention of other

3  officers that were arriving for the same class that I

4  was taking.

5      Once I was able to get someone's attention and he

6  was on his way to me, I removed the weapon from the

7  holster, set it in the passenger seat, and removed my

8  trauma kit from the headrest of my passenger seat to

9  hand to him once he got to my car.

10 Q    How much pain were you in at this point?

11 A    Excruciating.

12 Q    Did you realize that your femur had been broken?

13 A    No.

14 Q    Who's the first person you recall arriving at your

15 car?

16 A    Sergeant Vasconi.

17 Q    All right.  Do you recall any discussions with

18 Vasconi?

19 A    I remember him being in the passenger seat of my

20 car and just general conversation of him trying to keep

21 me calm and keep me awake, stating to him over and over

22 again I don't know what happened.  I never touched my

23 gun.

24 Q    Did you ever tell anyone that you shot yourself?

25 A    I don't remember if I -- if I did.

M. Vadnais - Direct

1  Q    Did you know that your weapon had a manufacturing

2  defect that morning?

3           MR. KELLY:  Objection.

4           THE COURT:  Sustained.

5  BY MR. BAGNELL:

6  Q    Did you know the history of the P320 that morning?

7           MR. KELLY:  Objection.

8           THE COURT:  Sustained.

9  BY MR. BAGNELL:

10  Q    Who arrived after Sergeant Vasconi?

11  A    I do not recall who the next person was to my car

12  at that point.  I want to say it was Officer Willis.

13  Q    Okay.  What did Officer Willis do?

14  A    He was attempting to apply a tourniquet on my leg.

15  Q    Was there a lot of bleeding?

16  A    I couldn't really tell from -- it wasn't like --

17  it wasn't like squirting blood or anything.  It was

18  more oozing, and my leg had swelled up so much that a

19  lot of it was going underneath.  So by looking directly

20  at the top of my leg, I couldn't tell just how much it

21  was bleeding at that point.

22  Q    At some point, do you have any recollection of

23  removing the weapon from your holster after it fired?

24  A    Yes.  After I got Sergeant Vasconi's attention and

25  he was on his way over, I removed it from my holster,

M. Vadnais - Direct

1  sat it in my passenger seat.

2  Q    Why did you do that?

3  A    To get it away from me because I didn't know why

4  it went off.

5  Q    Approximately how long did you remain in the car

6  before the EMT personnel arrived?

7  A    Ten, fifteen minutes maybe.

8  Q    Do you recall meeting Lieutenant Buckman at the

9  scene?

10 A    Yes.  I remember because he was the first person

11 from my department that showed up at my car.

12 Q    And did you know him before this incident?

13 A    Yes.

14 Q    How did you -- how?

15 A    I've had a couple of calls with him here and

16 there.

17 Q    What was his rank?

18 A    Lieutenant.

19 Q    Was he the highest ranking officer at that scene?

20 A    At the time.

21 Q    What did you say to him when he arrived?

22 A    The minute I saw him at my driver's side door, I

23 said, Lieutenant Buckman, I don't know what happened.

24 I never touched my gun.

25 Q    Do you remember what he said in response?

M. Vadnais - Direct

1    A    I don't.

2    Q    All right.  So who removed you, if you remember,

3    from the patrol car to the ambulance, Marcie?

4    A    EMS.

5    Q    Before we talk about that, the casing, the spent

6    casing, can you explain to the jury what happens when a

7    gun, a semi-automatic pistol, is fired?  The concept or

8    the fact of a spent casing, what is that?

9    A    It's an ejected round.

10   Q    All right.  When you say "ejected round," what is

11   the round?

12   A    The jacket, I guess you would call it, from the

13   bullet.  Once the bullet, which is the projectile, is

14   fired, then the casing backside of it that has the

15   primer is ejected out of the weapon.

16   Q    In what direction is it normally ejected?

17   A    On my weapon, it would go out to the right.

18   Q    And with what force does it typically -- and I'm

19   asking this based on your experience having fired

20   thousands of rounds of ammunition.  In which direction

21   does a spent casing typically go out of a

22   semi-automatic?

23            MR. KELLY:  Objection.

24            THE COURT:  She can testify based on having

25   fired several thousand rounds.  If you have contrary

M. Vadnais - Direct

1  evidence, that's fine.  Overruled.

2  A    I'm sorry.  One more time?

3  Q    I'm talking about P320 specifically.  That's a

4  semi-automatic pistol, correct, a 9 millimeter?

5  A    Yes.

6  Q    Nine millimeter ammunition?

7  A    Yes.

8  Q    When that gun is fired, which direction does a

9  spent casing typically come out of the gun?  Where does

10 it go?

11 A    To the right.

12 Q    Does it -- with what force -- can you describe the

13 velocity with which it moves out of the gun?

14 A    I wouldn't know.

15           MR. KELLY:  Objection.

16 BY MR. BAGNELL:

17 Q    You wouldn't know.  Okay.

18     Where was the casing of this round that broke your

19 femur found?

20 A    In the fold of my hoodie on my left side.

21 Q    On your left side?

22 A    Yes.

23 Q    Is it your understanding, then, that that casing

24 did not eject to the right?

25 A    I don't see how it could have and then landed on

M. Vadnais - Direct

1    my left.

2    Q    Who found the casing on the left side?

3    A    I don't remember who pointed it out to me.  I just

4    remember that I went to pick it up, and somebody told

5    me don't touch it.

6    Q    If you had drawn your weapon, as Mr. Joyce

7    suggested, out of your holster, cleared the holster,

8    would the ejection port have been clear of the holster

9    at that point?

10   A    Yes.

11   Q    And where would the spent casing have gone?

12              MR. KELLY:  Objection, calls for speculation.

13              THE COURT:  That would at this point.  I will

14   sustain the objection.

15   BY MR. BAGNELL:

16   Q    You're taken to the hospital, Marcie?

17   A    Yes.

18   Q    Okay.  Who was your surgeon?

19   A    There was Dr. Gasho.

20   Q    Do you remember:  What kind of treatment did you

21   receive after you arrived at the hospital?

22   A    I don't remember being in the hospital.  I

23   remember EMS getting me to the hospital and me going

24   through the doors, and they had the trauma team there

25   waiting for me.  That was close to the last thing that

M. Vadnais - Direct

1  I remember seeing until it was about time for me to

2  leave from there to go to the next hospital days later.

3       But I know while I was at that hospital, they had

4  done X-rays, tons of pain medication.  They did a CT

5  scan.  They did the surgery that morning, and that's

6  when they put the rod, the screw, and the bolt in my

7  leg.

8  Q    All right.

9  A    I also had got a blood transfusion from the amount

10 of blood loss that I had suffered.

11 Q    All right.  What kind of rod is in your leg,

12 Marcie?

13 A    Titanium.

14 Q    Who made the decision to put that in your leg?

15 A    Dr. Gasho, I would assume.

16 Q    Is it ever coming out of your leg to your

17 knowledge?

18            MR. KELLY:  Objection.

19            THE COURT:  Has anyone told you that it's

20 going to come out of your leg?

21            THE WITNESS:  No.

22 BY MR. BAGNELL:

23 Q    Is it in your leg today?

24 A    Yes.

25 Q    To your knowledge, Marcie, could you stand without

M. Vadnais - Direct

1    that rod in your leg right now?

2              MR. KELLY:  Objection.

3              THE COURT:  Well, the witness can testify as

4    to what she thinks she could do or not.  You can probe

5    it on cross, but no.  Overruled.

6              Ask your question.

7              MR. BAGNELL:  Yes, Your Honor.

8    BY MR. BAGNELL:

9    Q    Did your husband arrive at the hospital?

10   A    At some point, yes.

11   Q    Okay.  How long were you in the hospital, Marcie?

12   A    I think I was at the trauma center for -- I think

13   it was eight days, but I don't quite remember.

14   Q    All right.  Were you shown X-rays of the damage to

15   your right femur at some point?

16   A    At some point down the road.

17   Q    Do you recall seeing those?

18   A    Yes.

19             MR. BAGNELL:  Your Honor, I would like to

20   show the jury an X-ray of the injury.

21             THE COURT:  Wait a minute.  What exhibit

22   number is it?

23             MR. BAGNELL:  Your Honor, it is -- Your

24   Honor, I would introduce them as part of Marcie's

25   medical records which the defense has offered with no

M. Vadnais - Direct

1  objection.  The defendants have offered -- designated

2  about 3,000 documents as Marcie's medical records.  The

3  X-rays are, of course, included in the medical records.

4          THE COURT:  You've got to be more specific

5  than that.  This record is not going to be in any kind

6  of shape.  Is it a defense exhibit?

7          In which case there can't be an objection to

8  your own exhibit, Mr. Kelly?

9          MR. BAGNELL:  Defense Exhibit 40, Your Honor,

10  Winchester Medical Center radiology reports;

11  Exhibit 39, also Reston Hospital Center radiology

12  reports.

13          THE COURT:  Well, wait.  One at a time.

14          MR. BAGNELL:  I'm sorry.

15          THE COURT:  Again, we have medical people

16  coming in to testify about these, correct?

17          MR. BAGNELL:  That's correct, Your Honor,

18  yes.

19          THE COURT:  I'm not convinced this is the

20  best witness to be talking about them.

21          MR. BAGNELL:  That's fine, Your Honor.  I

22  just thought the jury might want to see it earlier than

23  later.  Yes.  I would introduce them normally through

24  Dr. Lande.

25          THE COURT:  All right.  Let's do it the right

M. Vadnais - Direct

1   way.

2          MR. BAGNELL:   Okay.

3   BY MR. BAGNELL:

4   Q    Marcie, can you describe the kind of pain you had

5   after your surgery at the hospital?

6   A    At the time I was at the hospital, I was so very

7   heavily medicated, like I said, I don't really remember

8   being there.  Walking was impossible.  It was enough to

9   where they had me on a lot of very heavy pain narcotics

10  the whole time I was there and even once I left there

11  and went to the rehab center.

12  Q    Were you able to work at all?

13  A    No.

14  Q    How long were you out of work?

15  A    It was ten months before I went back part-time

16  working four-hour days.

17  Q    Ten months.  Okay.

18          THE COURT:  Ms. Vadnais, after you were in

19  the trauma unit, where did you go next?

20          THE WITNESS:  I went to Winchester

21  Rehabilitation Center where I spent just over a week

22  with them rehabilitating me, getting me back to where I

23  could use my leg.

24          THE COURT:  Was that an inpatient?  In other

25  words, you're sleeping there 24/7?

M. Vadnais - Direct

1          THE WITNESS:  Yes, ma'am.

2          THE COURT:  All right.  And then where did

3     you go after that week?

4          THE WITNESS:  After that, I was released

5     home.

6          THE COURT:  What treatment, if any, did you

7     receive after you went home?

8          THE WITNESS:  Just care from my family.

9          THE COURT:  Was there any physical therapy or

10    any follow-up --

11         THE WITNESS:  Oh, yes.  I'm sorry.  Yes, I

12    did go to the doctor every four weeks for re-X-ray and

13    consult with the orthopedic surgeons and did physical

14    therapy twice a week.

15         THE COURT:  All right.

16         MR. BAGNELL:  Your Honor, I'd like to

17    introduce as Plaintiff's Exhibit 47 Marcie's 2017 and

18    2018 W-2s.

19         THE COURT:  I assume there's no objection to

20    that.

21         MR. KELLY:  No objection, Your Honor.

22         THE COURT:  All right.  Exhibit 47 is in.

23    BY MR. BAGNELL:

24    Q    Would you take a look at that exhibit, Marcie,

25    please.

M. Vadnais - Direct

1   A    Yes.

2   Q    All right.  Can you tell the jury what you were

3   earning in 2017 before this incident happened based on

4   that W-2?

5   A    My wages and tips and other compensation was just

6   under $63,000.  It was $62,867.79.

7   Q    And in 2018, after the injury you sustained, what

8   was your 2018 W-2 income?

9   A    $24,717.46.

10           MR. BAGNELL:  Your Honor, I'd also like to

11  offer Exhibit 48, medical invoice records for the

12  medical treatment of Marcie.

13           THE COURT:  Is there any objection?

14           MR. KELLY:  No objection.

15           THE COURT:  All right.  It's in.

16           THE CLERK:  Is that plaintiff's or

17  defendant's?

18           THE COURT:  Plaintiff's 48.

19  BY MR. BAGNELL:

20  Q    Please flip through those, Marcie, when you can.

21  A    Okay.

22  Q    Okay.  Can you tell the jury what those documents

23  are?

24  A    They are the medical bills for all of my treatment

25  up to this point -- or I believe up to March.

M. Vadnais - Direct

1    Q    Do you know what the approximate total of your

2    past medical expenses is?

3    A    I believe it's around $240,000 at this point.

4    Q    You're having ongoing therapy; is that correct?

5    A    Correct.

6    Q    How often do you have that?

7    A    Twice a week.

8    Q    Your lost wages to date, Marcie, do you have a

9    sense of what those are?

10   A    Just going based off the W-2s, it's around

11   40-something thousand dollars.

12          MR. BAGNELL:  Your Honor, I'd like to offer a

13   demonstrative, which is a summary previously disclosed

14   to the defendants of her medical expenses to date and

15   lost wages, past and going to the future.

16          THE COURT:  Is there any objection to that

17   summary?

18          MR. KELLY:  I would like to take a look at

19   it, Your Honor.

20          THE COURT:  All right.  Take a look at it,

21   please.

22          MR. KELLY:  Your Honor, I do have an

23   objection.  There's no foundation for a portion of this

24   summary.

25          THE COURT:  Which portion are you objecting

M. Vadnais - Direct

1  to?

2          MR. KELLY:  Lost future wages.

3          MR. BAGNELL:  I'll lay a foundation.

4          THE COURT:  All right.  Lay a foundation

5  first.

6  BY MR. BAGNELL:

7  Q    Marcie, how many years of service do you have

8  right now with the LCSO?

9  A    Just over eight years.

10 Q    Are you working part-time?

11 A    Correct.

12 Q    How many hours a day?

13 A    Four.

14 Q    What is the normal tenure of a deputy sheriff at

15 the Loudoun County Sheriff's Department?

16         MR. KELLY:  Objection, foundation.

17         THE COURT:  Only an officer would know that.

18 Overruled.

19 A    Twenty years.

20 Q    As to the best of your knowledge -- you've been an

21 officer eight years now?

22 A    Correct.

23 Q    Is that fairly common across the country, 20 years

24 of service and then you're done?

25 A    Sometimes people will go a little bit extra.

M. Vadnais - Direct

1  Q     So you're in your eighth now?

2  A     Yes.

3  Q     To your knowledge, you won't be returning

4  full-time for the remaining of your 12 years; is that

5  correct?

6  A     It's up in the air but most likely not.

7             MR. BAGNELL:  Your Honor, I would offer at

8  this point that the foundation has been laid that she

9  has lost future wages.

10            THE COURT:  I think that's sufficient.  I'm

11 going to allow it in.  Normally, the rules of evidence

12 allow the summaries to go into evidence.  They don't

13 have to just be a demonstrative.

14            What exhibit number do you want to put on

15 this one?

16            MR. BAGNELL:  Your Honor, that is Exhibit --

17            THE COURT:  I think it's 52.  Is that right?

18            MR. BAGNELL:  It's 50, Your Honor,

19 Plaintiff's 50, medical expenses, wage loss, summary

20 demonstrative.

21            THE COURT:  Plaintiff's 50?

22            MR. BAGNELL:  Plaintiff's 50, yes, Your

23 Honor.

24            THE COURT:  Not in my book it's not.  If I

25 have your exhibits, my 50 -- and these exhibits have to

1 be in sync.

2          MR. BAGNELL:  Maybe 49.  It should be 50.

3 It's toward the very end of the exhibit book, just the

4 one-page document, a one-page summary.

5          THE COURT:  There it is.  All right.

6          I don't know what exhibit it is in your book,

7 Ms. Vadnais.

8          THE WITNESS:  It is 49.

9          THE COURT:  All right.  It's 49.  I am

10 letting 49 into evidence.

11          MR. BAGNELL:  Sorry about that, Your Honor.

12          Okay.  If you could, zoom in on that.

13 BY MR. BAGNELL:

14 Q    Your total expenses, medical expenses are 235, do

15 you see that, Marcie?

16 A    Yes.

17 Q    And then your wage loss through June 1, a couple

18 of days from now, 50,867, do you see that?

19 A    Yes.

20 Q    And your future wage loss through your normal

21 retirement in 12 years, 457,803.96, correct?

22 A    Yes.

23 Q    For a total of 508,671, correct?

24 A    Correct.

25 Q    Are you still consulting physicians to date,

M. Vadnais - Direct

1  Marcie?

2  A     Yes.

3  Q     Can you identify who they are?

4  A     I received a second opinion on my leg from

5  Dr. Aguiar.  He is an orthopedic surgeon as well.

6  Q     I'm sorry.  Have any of them cleared you to return

7  to full-time work?

8              MR. KELLY:  Objection.

9              THE COURT:  She would know that.  There's no

10 basis to object.  Overruled.

11             I'm sorry.  What was the answer?

12             THE WITNESS:  No.

13 BY MR. BAGNELL:

14 Q     Could you possibly chase a suspect with that rod

15 in your leg, Marcie?

16 A     I doubt it.

17 Q     I assume the sheriff's office has not offered to

18 return you to full-time duty.

19 A     No.

20 Q     Would you be able to engage in any kind of combat

21 with a suspect or a perpetrator of a crime with your

22 leg in this condition?

23 A     I can barely walk.  I would not be able to wrestle

24 with somebody.

25 Q     I want to ask you some questions I really haven't

M. Vadnais - Direct

1  asked you about yet.  The emotional effect this has

2  had, you know, Marcie, the mental distress, the effect

3  it's had on your life and your family life, can you

4  tell the jury a little bit about how your life has

5  changed before that morning and since then, in the 16

6  months or so since then?

7  A    It's completely changed.  Everything about my life

8  has changed.  Everything about my kids' lives has

9  changed.  Everything about my marriage has changed.

10  There's not a whole lot that I can do now that I was

11  able to do before.

12      My kids are very active.  I usually end up having

13  to stay back and not being able to go to their events.

14      My husband has become Mr. Mom.  He's got to do the

15  laundry, the cooking, the cleaning, the grocery

16  shopping.  The housework is a full-time job.

17      My oldest teenage daughter had to be my chauffeur

18  all of last summer when I couldn't drive.  She had to

19  drive me to and from places.

20      My kids and my husband have had to help me -- when

21  I first came home from the hospital, help me shower,

22  help me use -- use, you know, the bathroom because I

23  couldn't bend my leg.  It's -- it still affects me to

24  this day.

25      My daughter runs track.  I can't sit at her track

M. Vadnais - Direct

1   meets because when they start the race and they fire

2   the gun, I -- the smell hits me.  It's not the sound.

3   It's the smell.  And I have been in the parking lot in

4   tears dry heaving just from the smell of that going

5   off, and it's not even a weapon, let alone being able

6   to bring myself to handle a weapon now.  I don't know

7   how I will ever be able to do my job again because I

8   can't -- it's destroyed my life.

9       I have worked so hard to get where I am and to be

10  who I am so that my kids are proud of me and look up to

11  me, and this company destroyed that from me.  I have --

12  all I have tried to do is be a mom, have a career, be

13  successful, and their carelessness took that away from

14  me.  And they don't care.  They don't care.  How many

15  times is this going to happen?

16          MR. KELLY:  Objection.

17          THE COURT:  Ms. Vadnais, you do have to take

18  it easy and just calm down.

19          I think we'll give the jury a break.  I'll

20  let you know when we need you back.  We'll take break.

21      (The jury exits at 3:24 p.m.)

22          THE COURT:  I recognize this is a very

23  difficult case for you, but this is still a court of

24  law.

25          THE WITNESS:  I know.  I am sorry, ma'am.

M. Vadnais - Direct

1           THE COURT:  We can't have this outburst

2   again.  All right.

3           Counsel, you should have counseled your

4   client.  I noticed at the hearing last week or two

5   weeks ago -- the last hearing that we had, Ms. Vadnais

6   got very emotional just at the hearing.  You have to

7   work with your client.  All right.  Because you don't

8   want to create a record that is a problem for you down

9   the road.  All right.

10          MR. BAGNELL:  Yes, Your Honor.  I thought I

11  had to explore the emotional distress area.  I'm sorry.

12  I understand.

13          THE COURT:  All right.  The jury will get the

14  standard jury instruction that a decision can't be

15  based on sympathy or emotion.  This is a rational

16  evaluation.  So this is not good.

17          All right.  I am going to give five or ten

18  minutes for your client to calm down.

19          MR. BAGNELL:  All right.  Thank you, Your

20  Honor.

21          THE COURT:  All right.  We'll recess court

22  for ten minutes.

23       (Recess from 3:26 p.m. until 3:37 p.m.)

24       (The jury is not present.)

25          THE COURT:  All right.  Are you under

M. Vadnais - Direct

1  control?

2          THE WITNESS:  Yes, ma'am.  I apologize.

3          THE COURT:  All right.  Are you ready for the

4  jury?

5          MR. BAGNELL:  One question, Your Honor.

6          THE COURT:  Yes.

7          MR. BAGNELL:  We have premarked all of the

8  Loudoun County exhibits to avoid wasting the jury's

9  time.  I don't know if you want to move them all into

10  evidence at this time.  I'd offer it as a suggestion.

11  We agreed on marking --

12          THE COURT:  All right.  What are the numbers?

13          MR. BAGNELL:  Yes, Your Honor.  Exhibit --

14          THE COURT:  Whose exhibits?  Plaintiff's or

15  defendant's?

16          MR. BAGNELL:  Defendant's, Your Honor.

17  Defendant's 19A --

18          THE COURT:  All right.  19A is what?

19          MR. BAGNELL:  The pants.

20          THE COURT:  All right.  Go ahead.

21          MR. BAGNELL:  19B is the subject holster.

22          THE COURT:  All right.

23          MR. BAGNELL:  19C, the magazine and rounds.

24  19D is the spent casing.  19E is the bullet.  19F is

25  Marcie's clothing other than the pants.  19G is a

M. Vadnais - Direct

1  tactical jacket, and 19H is one boot.  Exhibit 20 was

2  previously the weapon, Your Honor.  So we agreed on

3  that, Your Honor.

4          THE COURT:  All right.  No problems,

5  Mr. Kelly?

6          MR. KELLY:  Well, Your Honor, trusting that

7  what's in the bag is what has been described, I'm

8  familiar with what I think is in the bag.  So I

9  shouldn't have a problem.  I take it we're not going to

10 have any foundational testimony about this.

11         THE COURT:  Well, I'm assuming you're going

12 to show the items to the witness and have her give them

13 some narrative.

14         MR. BAGNELL:  Yes, Your Honor.  I just didn't

15 want to --

16         THE COURT:  All right.  That's fine.

17         All right.  Let's bring the jury in.

18         THE COURT SECURITY OFFICER:  Yes, Judge.

19     (The jury enters at 3:39 p.m.)

20         THE COURT:  All right.  Folks, thank you.

21 We'll continue with the testimony.

22 BY MR. BAGNELL:

23 Q   Marcie, we were talking about the distress the

24 injury has caused you and the effect it's had on your

25 life.  I just want to ask you a few more questions

M. Vadnais - Direct

1  about this subject area.

2      Mentally, Marcie, do you suffer from nightmares

3  about the incident?

4  A    Nightmares, anxiety, panic attacks, sleeplessness.

5  Q    How frequently does that occur?

6  A    A couple of times a week.

7  Q    Do you have trouble sleeping?

8  A    Yes.

9           THE COURT:  We're having trouble hearing you,

10  so speak into that close to your mouth.

11          THE WITNESS:  Yes.

12  BY MR. BAGNELL:

13  Q    You need to keep your leg elevated; is that

14  correct?

15  A    Yes.  This is the most comfortable way for me to

16  sit for any extended period of time.

17          THE COURT:  What happened to the microphone?

18  Is that not working?  All right.  Bring it closer.  All

19  right.

20          THE WITNESS:  Is that better?

21          THE COURT:  Yes.

22          THE WITNESS:  Okay.

23  BY MR. BAGNELL:

24  Q    I asked you a question, Marcie.  I think you

25  talked a little bit about the effect it's had on your

M. Vadnais - Direct

1  marriage and that your husband's had to become Mr. Mom

2  in effect.

3  A    Yes.

4  Q    Does he work full-time?

5  A    Yes.

6  Q    The effect on your children, have you been able to

7  afford to hire any kind of a nanny or anything like

8  that?

9  A    No.

10 Q    Your part-time work now, Marcie, can you compare

11 it to your job before the gun shot your leg?

12 A    I don't think there is really a way to compare

13 being a patrol officer to sitting behind a desk doing

14 secretarial work.  I literally sit behind a computer

15 for four hours a day recording inmate phone calls where

16 before that's not even close to what I was doing.

17 Q    Is it upsetting to you?

18 A    Yeah.  It's not what I signed up to do.

19 Q    When you were admitted to the hospitals, the

20 medical treatment that you received, Marcie, did any

21 doctors ever interview you about what happened that

22 morning?

23 A    I do not remember.

24 Q    Were any of them weapons experts to your

25 knowledge?

M. Vadnais - Direct

1  A    I don't believe so.  I don't know.

2  Q    Did you ever tell any of them that you did this to

3  yourself?

4  A    I don't recall speaking to any of the doctors.  By

5  the time I had gotten to the hospital, I had already

6  received two shots of fentanyl in the ambulance and

7  don't recall speaking to anybody.  I don't recall

8  seeing anybody.  I don't even remember my husband

9  showing up.

10  Q    Since the narcotic -- I'm trying -- the whole

11  period of medical treatment -- I understand when you

12  first went in, you were under heavy pain medication.

13  Is that correct?

14  A    (Nods head up and down.)

15  Q    At any time during your medical treatment in the

16  last 16 months, have you ever stated to a doctor, I

17  drew my weapon and I shot myself in the thigh?

18  A    No.

19         MR. BAGNELL:  Your Honor, one minute, please.

20  I just want to confer with counsel.

21         THE COURT:  All right.

22    (Counsel confer.)

23  BY MR. BAGNELL:

24  Q    Okay.  Marcie, did Internal Affairs conduct an

25  investigation of this incident at some point?

M. Vadnais - Direct

1    A    Yes.

2    Q    Loudoun County?

3    A    Yes.

4    Q    Who conducted that?

5    A    Sergeant Berger.

6    Q    And what's Sergeant Berger's position?

7    A    He is the internal investigations sergeant.

8    Q    And did he visit you in the hospital?

9    A    No, I don't believe so.

10   Q    Did he ever interview you?

11   A    He came to my house the day I was released from

12   the hospital to interview me.

13   Q    And what did you tell him about the incident?

14   A    Basically, the same thing I told you guys, that

15   while trying to remove the holster from my belt, that

16   it fired, and I didn't understand how it could have

17   happened because I never touched my gun.

18   Q    All right.  And did Internal Affairs come to any

19   conclusion, to your knowledge, about that incident that

20   morning?

21   A    Their conclusion to it was a --

22              MR. KELLY:  Objection.

23              THE COURT:  Well, she can testify to what she

24   was told.  All right.  It's not being offered for the

25   truth of its contents but what she was asked and what

M. Vadnais - Direct

1  she was told.  It's all right.  Overruled.

2  A    I was told I was being given a squad counsel,

3  which is not a reprimand or a write-up, for my firearm

4  discharging.

5  Q    Let me ask it a different way:  Was that

6  considered a disciplinary action against you to your

7  knowledge?

8  A    No.  The way it's been explained to me, that is

9  not considered disciplinary.

10  Q    Were you actually given any counseling about the

11  incident by Internal Affairs?

12  A    No.  No.

13  Q    Did Internal Affairs do any research into the

14  weapon that you know of?

15  A    Not to my knowledge.

16  Q    The impact this has had on your marriage, Marcie,

17  can you tell the jury how it has complicated your

18  marital relationship?

19  A    A lot of added stress, more so than what there

20  already is in a marriage with, you know, three kids.

21  It got to a point that -- there was a short period of

22  time where we actually separated because the stress on

23  him was so great, and that's the only time in our

24  entire 18 years of being married and 21 years of being

25  together that we've ever separated.

M. Vadnais - Direct

1  Q     And the kids witnessed this separation; is that

2  correct?

3  A     Yes.

4  Q     Were you able to detect an effect on them

5  observing that?

6  A     Yeah.  I mean, having to go back and forth between

7  where I was staying and home and, you know, trying to

8  make sure that my birthday, which fell in that same

9  time frame, that they got time with me but then they

10 got time with their dad too.  Their sister was in town

11 from Missouri where she goes to school, trying to make

12 sure that I still saw them at least two days every

13 other day but also giving them time, you know, to spend

14 with their older sister.  It was hard on them.  It's

15 not something they've ever experienced.  They've, you

16 know...

17 Q     In your entire life, Marcie, has anyone ever

18 accused you of trying to hurt yourself?

19 A     No.

20 Q     Do you have any criminal record along those lines,

21 trying to hurt yourself or hurt anyone else?

22 A     No.  I wouldn't be a law enforcement officer if

23 that was the case.

24 Q     Your personnel file, as we discussed, contains a

25 lot of citations, positive citations, correct?

M. Vadnais - Direct

1    A    Yes.

2    Q    You found a missing person on one occasion; is

3    that correct?

4    A    Several.

5    Q    All right.  Can you describe to the jury some of

6    those incidents?

7    A    I'm part of a search and rescue team and Project

8    Lifesaver.  So search and rescue -- at any given point,

9    if somebody is missing, whether it's somebody that's

10   suicidal, somebody that wandered off, got lost,

11   whatever the means may be, I'm part of the team that we

12   would respond out to help search for them.  Project

13   Lifesaver is along the same lines with search and

14   rescue except for it is more tailored towards children

15   that have autism or other mental disabilities that may

16   cause them to wander or get lost and older people that

17   may have dementia, Alzheimer's that can cause them to

18   wander and get lost as well.

19        So I'm part of the program that installs and sets

20   up for them to have a band that they wear, and then we

21   have receivers to where if they do wander and get lost,

22   that it's a radio frequency to where we can track them

23   down.

24        That's where we have the drone program too that

25   also can track them.  So I have gone to other agencies

M. Vadnais - Direct

1  to locate people.  I've located several people in our

2  agency, other counties.

3  Q    Did I hear you correctly that you talked someone

4  out of suicide at some point?

5  A    Yes.

6  Q    Who was that?  Can you describe that situation?

7  A    That was actually a call that I was on while I was

8  working patrol.  We got a call that there was a

9  mid-20-year-old who had got into an argument with his

10  father, locked himself in his bedroom, and was

11  threatening suicide.  We got there.  Everybody kind of

12  took their own corners of the house.

13      I realized one of the windows were open.  And so

14  while I was talking to dad at the front door, I

15  happened to see a cell phone light coming from one of

16  the bushes.  This is midnight, 1:00 in the morning.  So

17  it's pitch black out there.  I happened to see the cell

18  light -- cell phone light up.  He had been hiding over

19  there in the bushes watching all of us surround by his

20  apartment.

21      When he came out, he had a box cutter to his

22  throat.  And he had a drill that had a 2-inch drill bit

23  on it that he was holding to his head threatening

24  suicide because he was in a fight with his dad, and his

25  girlfriend was in the process of breaking up with him,

M. Vadnais - Direct

1  whatever that was.

2       But I was able to talk him into dropping both of

3  those weapons, dropping to his knees, and giving up

4  without anybody having to hit him with a beanbag

5  shotgun or taking any type of lethal force towards him

6  and took him into custody and took him to the hospital

7  for mental evaluation.

8  Q    Did you receive a commendation for that?

9  A    That may have been one of them.  I don't recall.

10 Q    Were you promoted during your tenure before the

11 February 7 incident at LCSO?

12 A    I am a deputy first class which is a higher rank

13 than a deputy, but it's more of a time on that you get

14 promoted.

15 Q    Did you receive raises?

16 A    Yes.

17 Q    And bonuses?

18 A    Yes.

19 Q    Did any of your -- you had supervising officers;

20 is that correct?

21 A    Yes.

22 Q    Did any of them ever give you any kind of

23 reprimand or performance criticism or write-up of any

24 kind during your tenure before this incident?

25 A    Never.

M. Vadnais - Direct

1        MR. BAGNELL:  Just 20 seconds, Your Honor.

2     (Counsel confer.)

3        MR. BAGNELL:  Sorry, Your Honor.

4  BY MR. BAGNELL:

5  Q    The lifesaver project you were doing, Marcie, can

6  you do that anymore?

7  A    No.

8  Q    Was that a big part of your career?

9  A    Yes.

10 Q    Did you enjoy that part of your work?

11 A    Very much so.

12 Q    Why can't you do it now?

13 A    I can't do anything that's not -- that is covered

14 under the basis of law enforcement duties.

15 Q    So are you literally sitting at a desk for four

16 hours a day?

17 A    Yes.

18 Q    Do you have difficulty driving?

19 A    Yes.

20 Q    Can you describe that?  How so?

21 A    My commute is about an hour long.  So sitting and

22 going from gas pedal to brake pedal, if I get stuck in

23 traffic, it's painful in my hip.  So I have to adjust

24 my hours to make sure that I can miss the traffic

25 coming to and from work.  And just that position alone,

M. Vadnais - Direct

1  my leg is not at a 90-degree -- that slight angle is

2  just enough that it causes the pain in my hip.

3  Q    Do you carry a weapon now?

4  A    No.

5  Q    Does the department still carry SIG Sauer P320s?

6  A    Yes.

7  Q    Were you ever issued a new P320?

8  A    No.

9  Q    Are you the only officer there who's unarmed, if

10  you know?

11  A    In the area that I work in, yes, besides

12  civilians.

13  Q    The badge you're wearing, Marcie, is that -- you

14  are still authorized to represent yourself to the

15  public as a deputy sheriff?

16  A    I would not wear this out in public, no.

17  Q    Can you not do that anymore?

18  A    No.

19  Q    Why not?

20  A    Well, I'm on light duty.  I can't go in the

21  confines of official duties.

22  Q    You can't patrol in other words anymore?

23  A    Yeah.

24  Q    Do you know if any of your colleagues were issued

25  new P320s at any time after the incident on February 7?

1          MR. KELLY:  Objection.

2          THE COURT:  I don't know how that's relevant.

3   Sustained.

4          MR. BAGNELL:  I'd like to offer, Your Honor,

5   Defendant's Exhibit 9 into evidence, Defendant's 9.

6          THE COURT:  It can't be an objection.  So

7   it's in.

8   BY MR. BAGNELL:

9   Q    Do you have that exhibit, Marcie?

10  A    Yes.

11  Q    All right.  Can you read what it states?

12         THE COURT:  Wait.

13         MR. KELLY:  Your Honor, may I see the

14  exhibit?  We have confusion about what these exhibits

15  are.

16      (Mr. Bagnell hands the exhibit to Mr. Kelly.)

17         THE COURT:  How is this witness qualified to

18  talk about this exhibit?

19         MR. BAGNELL:  Because it's the weapon she was

20  issued, Your Honor.  It's her weapon.  She qualified on

21  it three times, thousands of rounds through it.  I

22  think she's qualified.

23         MR. KELLY:  Your Honor, I object.  I don't

24  think the witness -- there's no foundation that could

25  be laid for this witness to talk about it.

M. Vadnais - Direct

1           THE COURT:  Let's lay a foundation at this

2    point.  Don't show it to the jury.

3    BY MR. BAGNELL:

4    Q    Marcie, I think you testified that you received

5    extensive training on the P320.

6    A    Correct.

7    Q    Its safety features?

8    A    Well, this doesn't have an external safety on it.

9    So we have function checks and how to assemble it

10   and --

11   Q    You were trained how to disassemble the weapon?

12   A    Yes.

13   Q    Take it apart in other words?

14   A    Yes.

15   Q    Take the slide off the frame?

16   A    Yes.

17   Q    How to release the magazine?

18   A    Yes.

19   Q    And there's no question in your mind that you were

20   issued a SIG Sauer P320?

21   A    Correct.

22           MR. BAGNELL:  Your Honor, I think it is a

23   sufficient foundation.

24           THE COURT:  Have you ever seen this document

25   before?

M. Vadnais - Direct

1          THE WITNESS:  I believe I saw this at my

2   deposition, but I'm not positive.

3          THE COURT:  No.  No.  During the time you

4   were at the Loudoun County Sheriff's Department?

5          THE WITNESS:  No, ma'am.

6          THE COURT:  Sustained.  This is not the right

7   witness for this exhibit.

8          MR. BAGNELL:  Thank you, Your Honor.

9   BY MR. BAGNELL:

10  Q    Just a few more questions, Marcie.

11       When the bullet entered your leg, can you describe

12  to the jury the entrance wound and whether there was an

13  exit wound from the bullet?

14         THE COURT:  Why are you having this witness

15  go through that?  Don't you have medical people who are

16  going to talk about this wound?  It's painful for her

17  to have to discuss it.

18         MR. BAGNELL:  They're my final questions,

19  Your Honor.  I just want to ask her --

20         THE COURT:  All right.  Let's move this

21  along.

22  BY MR. BAGNELL:

23  Q    Did you have an entrance wound, Marcie?  I know

24  this is hard to talk about.

25  A    Yeah.

M. Vadnais - Cross

1  Q     Did it leave a disfigurement in your thigh?

2  A     Yes.

3          MR. BAGNELL:  That's all I have, Your Honor.

4          THE COURT:  All right.  Mr. Kelly.

5          MR. KELLY:  Thank you, Your Honor.

6          May it please the Court.

7                    CROSS-EXAMINATION

8  BY MR. KELLY:

9  Q     Good afternoon, Ms. Vadnais.

10     A few minutes ago, Ms. Vadnais, you discussed the

11 Internal Affairs investigation that had been conducted

12 by Sergeant Berger.  Do you recall that?

13 A     Yes.

14 Q     Did you see Sergeant Berger in the courtroom

15 today?

16 A     No.

17 Q     Is it your understanding that Sergeant Berger's

18 role was to investigate the circumstances of your

19 accident?

20 A     His role is to determine if I violated any agency

21 policy.

22 Q     In fact, Sergeant Berger determined and his

23 superiors affirmed that you had violated agency policy

24 by failing to control your weapon in this accident;

25 didn't they?

M. Vadnais - Cross

1   A     Incorrect.

2   Q     Did you attend Sergeant Berger's deposition?

3   A     I did.

4   Q     And do you deny that you heard him say those

5   words?

6   A     You can read the general order word-for-word, and

7   that's not the general order I was written up for.

8   Q     You disagree with the finding?

9   A     No.

10  Q     Sergeant Berger found that you failed to control

11  your weapon; did he not?

12          MR. BAGNELL:  Objection, asked and answered,

13  Your Honor.

14          THE WITNESS:  That is not --

15          THE COURT:  Wait.  Wait.  Wait.  When there's

16  an objection, you shouldn't be answering.

17          I think it's already been asked and answered.

18  Sustained.

19          MR. KELLY:  Thank you, Your Honor.

20          Your Honor, I'd like to offer as exhibits SIG

21  Exhibit No. 12, page 62 and then page 65 that are

22  photos.  I'd offer to publish them before --

23          THE COURT:  Wait.  Defense Exhibit 12, pages

24  what, please?

25          MR. KELLY:  Pages 62 and 65.

M. Vadnais - Cross

1          THE COURT:  Is there any objection?

2          MR. BAGNELL:  No objection.

3          THE COURT:  All right.  Then they're in

4   evidence.  You may publish them.

5   BY MR. KELLY:

6   Q    Ms. Vadnais, you have that picture in front of you

7   now too; don't you?

8   A    Correct.

9   Q    Is that the picture of the cruiser where this

10  incident took place?

11  A    Yes.

12  Q    And is that the position where you parked it?

13  A    Yes.

14  Q    And is the trunk in the open position as you put

15  it that day?

16  A    Yes.

17          MR. KELLY:  And could we look at Number 65,

18  please.

19  BY MR. KELLY:

20  Q    And is Exhibit 12 at page 65 a depiction of the

21  interior cabin of your cruiser?

22  A    Yes.

23  Q    And can you describe for the jury the equipment

24  that can be seen in the interior compartment?

25          THE COURT:  Well, better than that, on the

M. Vadnais - Cross

1  screen -- hopefully it's working -- if you put your

2  finger on the screen, you can circle things as you

3  testify so we can see what you're talking about.

4  A    Okay.  Here are a necklace that I have for my

5  kids, and it's hanging on the spotlight handle that

6  comes down here.  This obviously is the steering wheel,

7  the windshield wiper.  This is my light box, my

8  computer.  It's hard to see, but this is my electronic

9  ticket printer.  This is my microphone or my radio mic.

10  It's hard to see.  The picture is very dark.  This is

11  my seat belt buckle there.  This across here is a

12  tourniquet and my seat, and this blue thing right there

13  is just a change holder.  That's about all.  The

14  picture is so dark I can't really make out a whole lot

15  more than that.

16  Q    Thank you.

17       You testified earlier that you had been trained on

18  the P320, correct?

19  A    Yes.

20  Q    And you had qualified on it on three occasions; is

21  that right?

22  A    Correct.

23  Q    And the qualification consists of firing 50 rounds

24  of the weapon; doesn't it?

25  A    Correct.

M. Vadnais - Cross

1  Q     From various locations?

2  A     Yes.

3  Q     So that the qualification with the P320 would have

4  consisted of three times shooting 50 rounds, correct?

5  A     I'm not sure.

6  Q     Well, you on -- on three occasions you qualified

7  each time you shot 50 rounds, correct?

8  A     Correct, to qualify.  But each time we're there

9  for four hours.  So we shoot more than just 50 rounds

10 and leave and go home.

11 Q     How many rounds did you shoot per session?

12 A     It depends on how many people show up for class

13 that day and how many times we can go through.

14 Q     And would the individuals who run the range agree

15 that you would have shot several thousand rounds of a

16 P320 in those three qualification sessions?

17 A     Oh, easily, yeah.

18 Q     And the weapons qualification was only part of

19 your training, correct?  You were trained in other

20 aspects of police work, correct?

21 A     Correct.

22 Q     Among those was how to remove a weapon from a

23 holster while you were seated in the vehicle,

24 correct --

25 A     Correct.

M. Vadnais - Cross

1  Q     -- in case you had to fire from a vehicle or some

2  other necessary reason?

3  A     Correct.

4  Q     Is that right?

5        And am I correct that part of that instruction

6  consisted of addressing the potential that you could

7  become tangled up in your seat belt and that the weapon

8  could become tangled in the seat belt?

9  A     Not become tangled but make sure that your seat

10 belt is not crossing it so that you have a cleared draw

11 from --

12 Q     Well, it did recognize that the seat belt could

13 come into contact with your weapon; didn't it?

14 A     The strap of it, yeah.  It all connects in the

15 same general area.

16 Q     The strap --

17 A     You need to make sure that everything is

18 maneuvered around it so that it doesn't get tangled.

19 Q     And you were taught that because the seat belt

20 strap itself could potentially interfere with your

21 handling of the weapon, correct?

22 A     If it's going -- if you leave your seat belt over

23 the top of your weapon, then you wouldn't be able to

24 draw your firearm in a situation if somebody was to

25 walk up to your vehicle.

M. Vadnais - Cross

1  Q    And was that a formal part of the course that you

2  took?

3  A    That was part of the academy training.  It was a

4  very short stint.

5  Q    I believe you discussed the clothing that you wore

6  the day of your accident.  And if I understand

7  correctly, it included a department-issued polo shirt,

8  a sweatshirt -- a hoodie sweatshirt, a nylon

9  windbreaker, a nylon belt, correct?

10  A    Yes.

11  Q    And that you were also wearing that day on your

12  belt your badge, correct?

13  A    Yes.

14  Q    And it was your intention to store the gun in the

15  trunk, right?

16  A    Yes.

17  Q    And if I understood your testimony correctly, your

18  reasoning in storing the gun in the trunk was because

19  the gun was not permitted in the academy building,

20  correct?

21  A    Correct, and I always store my firearm in my trunk

22  of my car.

23  Q    You were aware, were you not, of the availability

24  of lockboxes inside the academy building; weren't you?

25  A    At that time, no.

M. Vadnais - Cross

1  Q     You did not know that there were lockboxes

2  available where you could store your weapon?

3  A     At the time of my incident, no.

4  Q     You've learned since that they were there?

5  A     Yes.

6  Q     So literally, you could have entered the building

7  with your weapon, correct?

8              MR. BAGNELL:  Objection, vague.

9              THE COURT:  I don't think it's vague, but the

10 witness has said she doesn't know.  She didn't know the

11 box was there.  So the question is too speculative.  So

12 I will sustain the objection.

13 BY MR. KELLY:

14 Q     Was the trunk of your car the only place you could

15 have stored your weapon that day?

16 A     It's the only place that in common practice I had

17 been taught to store my weapon.

18 Q     Was there any reason why you had to remove the

19 holstered weapon from your belt in a seated position

20 inside the car?

21 A     Personal preference that day.

22 Q     So that you sat with that three layers of clothing

23 on your belt in that compartment that had lots of other

24 equipment in it and attempted to remove the holstered

25 weapon at that time, right?

M. Vadnais - Cross

1   A    Yes.  And you do realize I spend 12 hours of my

2   day in that vehicle.  So that's the confines of my

3   office.  So it's not constricting.

4   Q    And when you were attempting to remove the weapon,

5   you were seated, right?  You weren't standing as you --

6   as you did earlier to show the jury?

7   A    Correct.

8   Q    And the way you attached your holster that day was

9   to place the paddle between the belt and your trousers,

10  correct?

11  A    Yes.

12          THE COURT:  I'm not sure the jury knows

13  because I don't think you've used the term "paddle"

14  before.  Can you explain more specifically what you're

15  talking about there?

16          MR. KELLY:  Yes, Your Honor.  As a matter of

17  fact, can I walk over and get the exhibit?

18          THE COURT:  No.  We don't do it that way in

19  this court.

20      (An exhibit is given to Mr. Kelly.)

21  BY MR. KELLY:

22  Q    Ms. Vadnais, is my right hand on the paddle?

23  A    Yes.

24  Q    And it was the paddle that was between the belt

25  and your trousers, correct?

M. Vadnais - Cross

1   A    Correct.

2   Q    And the maneuver you were attempting to execute at

3   the time was to get the paddle over the belt, right, so

4   that you could remove the holster?

5   A    Correct.

6           THE COURT:  Just so we're clear, does the

7   paddle essentially snap onto the rest of the holster?

8           THE WITNESS:  No.  It's one piece.

9           THE COURT:  It's one piece?

10          THE WITNESS:  So it slides over -- like if

11  this is my belt, it's one piece.  It slides on and it

12  slides off as one whole piece.

13          THE COURT:  All right.  Thank you.

14  BY MR. KELLY:

15  Q    The paddle has what you've referred to as teeth,

16  correct?

17  A    Correct.

18  Q    And the teeth are designed to permit the paddle

19  and the rest of the holster to stay fastened to the

20  belt so that the holster doesn't come out when you pull

21  the weapon, right?

22  A    Correct.

23  Q    And it was designed that way to be difficult to

24  remove from the belt; wasn't it?

25          MR. BAGNELL:  Objection to the extent she's

M. Vadnais - Cross

1  not an expert in holsters.

2          THE COURT:  Well, do you have an

3  understanding from having been an officer as to why the

4  paddle was designed that way?

5          THE WITNESS:  I would be assuming that it --

6          THE COURT:  You can't.

7          The objection is sustained.

8  BY MR. KELLY:

9  Q    Did the difficulty in removing the holster tell

10 you that the holster was less likely to come off with

11 the gun when you had to draw the gun?

12 A    That would be the intent of it.  I wouldn't want

13 to draw a weapon that the holster hadn't come with it.

14 Q    And, in fact, you -- you had to, as you described

15 earlier, manipulate the paddle and the holster to get

16 it off of the belt, right?

17 A    I only had my hand on the holster, not the paddle.

18 My other hand was on my belt.

19 Q    But you had to basically move the paddle, move the

20 holster to get it to remove from the belt, correct?

21 A    They're one piece.  So if I'm moving the holster,

22 then the paddle itself would be moving automatically

23 with the holster.  So me moving the holster to maneuver

24 my belt over those teeth...

25          THE COURT:  Well, you're moving your belt

M. Vadnais - Cross

1  under the teeth; aren't you?

2           THE WITNESS:  The teeth are already on the

3  bottom of my belt.  So I'm moving my belt over the top

4  of them as the holster is coming up.

5           THE COURT:  All right.

6  BY MR. KELLY:

7  Q    Was there any reason why you couldn't have removed

8  the weapon from the holster before you attempted this

9  maneuver of taking the holster off of the belt?

10 A    It's my opinion that a holstered weapon is a safer

11 weapon than a naked gun.

12 Q    And you positioned your hands so that your left

13 hand was solely on the belt, correct?

14 A    Correct.

15 Q    And your right hand was wrapped around the widest

16 part of the holster?

17 A    Correct.

18 Q    And is this the widest part that I'm pointing to

19 here?

20 A    No.  The meatier part down at the bottom where you

21 can get all of your hand around.

22 Q    And was your -- were your right-hand fingers

23 underneath on the underside of the holster and your

24 thumb on top or otherwise?

25 A    Backside.

M. Vadnais - Cross

1  Q     Where were your fingers?  On the backside?

2  A     Yes.

3  Q     And your thumb was on the front side?

4  A     Yes.

5  Q     And is it still your belief to this day that you

6  never touched the gun even a little bit?

7  A     Not once did my hand touch that weapon until I

8  removed it to get it away from me.

9  Q     You did not tap it?

10 A     No.  No, sir.

11 Q     Did you do anything that would cause the slide to

12 move while you were maneuvering the weapon?

13 A     No.

14 Q     And you're 100 percent certain that the trigger

15 was never pulled, correct?

16 A     Absolutely without a doubt.

17 Q     One of the reasons you're sure the trigger was

18 never pulled was that it's your belief that it remained

19 fully seated in the holster and you couldn't access the

20 trigger if the weapon was fully seated in the holster,

21 correct?

22 A     Correct, and I was looking at both of my hands the

23 entire time.

24 Q     Would you agree that if a weapon is partially or

25 wholly out of the holster, you actually can access and

M. Vadnais - Cross

1  pull the trigger?

2  A    I would -- I don't know.  I have never taken this

3  gun and attempted that.

4  Q    Well, you've taken the weapon out of the holster

5  and pulled the trigger; haven't you?

6  A    Pulled it, yes.

7  Q    And in the number of rounds that you have fired,

8  every time that you have fired the weapon, it cycled

9  and ejected a spent casing; didn't it?

10  A    Correct.

11  Q    Does the spent casing always go in the same place?

12  A    It always goes to the right.

13  Q    And what happens to a spent casing if it contacts

14  another object after it goes to the right?

15  A    It depends on what that object is, I guess.

16  Q    Can it ricochet and move to another location?

17  A    It could.  It could go down somebody's shirt.

18  Q    If it bounced off a window, a car window or the

19  ceiling of a car cabin, it could wind up in someplace

20  other than to the right; could it not?

21  A    I guess it's possible.

22  Q    After the shot was fired that injured you, you hit

23  the horn on your cruiser; didn't you?

24  A    Yes.

25  Q    And that actually activated a siren?

M. Vadnais - Cross

1   A      Yes.

2   Q      And your point in doing that was to get some help,

3   right?

4   A      Correct.

5   Q      And help arrived; didn't it?

6   A      Yes.

7   Q      And were you able to communicate with the people

8   who helped you?

9   A      I remember speaking to them, talking to them, them

10  trying to keep me calm and talking to me.

11  Q      You were able to, for example, converse with the

12  EMT on the way to the hospital; weren't you?

13  A      I briefly remember giving him my husband's cell

14  phone number and remember him and the other EMT having

15  a conversation.

16  Q      And when the 911 call was placed by Deputy

17  Bietsch, you were able to answer her questions and

18  provide her with your age and the address of the

19  academy; weren't you?

20  A      I was not speaking to her.  I was relaying

21  information to the officers that were closest to me,

22  and they were relaying it back to her.

23  Q      But you were able to provide that information,

24  correct?

25  A      Yes.

1  Q    And did you ever say to anyone at the scene of the

2  accident, I don't know how the gun got out of the

3  holster?

4  A    No.

5  Q    And you in the course of this case have heard

6  testimony from Deputy Bietsch and from Deputy DeLage;

7  haven't you?

8  A    Yes.

9  Q    And have you heard them both say that you said

10  repeatedly, I don't know how the gun got out of the

11  holster?

12  A    I believe one of them said I said that one time,

13  but I don't remember them saying that I was repeating

14  it.  The only thing I remember repeating was that I

15  don't know how it went off because I never touched my

16  gun.

17  Q    Well, do you deny having said that to Deputy

18  DeLage and Deputy Bietsch?

19  A    Yes.

20  Q    Is it your belief that they're both mistaken in

21  recounting your statement that way?

22  A    Absolutely.  There was a lot of chaos that

23  morning.

24  Q    And when you were at the hospital, you told one of

25  the medical personnel that your gun had come out of its

M. Vadnais - Cross

1  holster and fired into your right thigh.  Do you recall

2  that?

3  A    No.  I already said I don't remember anything once

4  I got to the hospital.

5         MR. KELLY:  Your Honor, I'd like to publish

6  SIG Exhibit 36, which is a part of the stipulated

7  medical record.

8         THE COURT:  All right.  I think there's no

9  objection.

10         MR. BAGNELL:  No objection.

11         THE COURT:  All right.

12         MR. KELLY:  Can that be blown up at all?

13         THE COURT:  We can put it on the screen.  It

14  will be on the screen.

15         MR. KELLY:  Okay.  There you go.

16  BY MR. KELLY:

17  Q    Ms. Vadnais, does that language -- and I'm

18  referring to the section under HPI that starts with

19  37-year-old female.  Does that refresh your

20  recollection as to what you said to medical personnel

21  when you were in the hospital?

22  A    I don't remember anything once I wheeled into the

23  hospital and saw a trauma team.  So I have no -- I have

24  never seen this, and I have no recollection of what it

25  is or what I said.

M. Vadnais - Redirect

1  Q    So you're not denying that you said it.  You just

2  don't recall.  Is that correct?

3  A    I don't see why I would have said that.  But at

4  this point, I was in so much pain and on so much pain

5  medication, I have no idea what I could have said.

6         MR. KELLY:  Your Honor, those are all the

7  questions I have for this witness.  Thank you.

8         THE COURT:  That fine.

9         Is there any redirect?

10         MR. BAGNELL:  Yes, Your Honor.

11                   REDIRECT EXAMINATION

12  BY MR. BAGNELL:

13  Q    Marcie, Mr. Kelly asked you some questions about

14  the clothing you were wearing that morning.  Do you

15  recall that?

16  A    Yes.

17         MR. BAGNELL:  Your Honor, at this point, I

18  guess I would like to have the exhibits containing her

19  clothing opened so the jury can at least view them.

20         THE COURT:  All right.  That shouldn't be a

21  problem.

22         MR. BAGNELL:  This would be 19A, 19F, and

23  19G.

24  A    Do you want me to open all three of them?

25  Q    Yes, please.  Is it possible to open --

M. Vadnais - Redirect

1  A     Yeah.

2  Q     Okay.  Marcie, if you could, hand that to the

3  marshal.

4      If you could, just show that to the jury, Marcie.

5  Those are the pants you were wearing that morning?

6  A     Yes.

7  Q     Okay.  Thank you.

8            THE COURT:  We have a photographic

9  substitution for that, correct?

10           MR. BAGNELL:  We do, Your Honor.  We have a

11 demonstrative of that, yes.

12           THE COURT:  What's the exhibit number?

13           MR. BAGNELL:  Fifty-one, Your Honor.

14           THE COURT:  Plaintiff's 51?

15           MR. BAGNELL:  Plaintiff's 51, yes.

16           THE COURT:  No.  I think it's Plaintiff's 50.

17           MR. BAGNELL:  It could be 50, Your Honor.

18 Apparently, there's a slight misnumbering problem.  I

19 apologize for that.

20           THE COURT:  I'm not going to send the

21 clothing back to the jury.  You have a photograph you

22 can see.

23           It's 50 according to my book.  Is that

24 consistent with the defendant's?

25           MS. HOOE:  No, Your Honor.  I think there's

M. Vadnais - Redirect

1   just a little confusion with the numbering.  So perhaps

2   at the next break we can figure it out.

3          THE COURT:  All right.  Overnight I want

4   these exhibit numbers worked out so the jury will know

5   what we're talking about.

6          In any case, there should be a photographic

7   substitution for that particular exhibit.

8          MS. HOOE:  We have it as 51.

9          THE COURT:  No.  We don't need it now.  Let's

10   continue.

11          But for the jury's purposes, 19A is the

12   actual pants that were being worn that day, correct?

13          MR. BAGNELL:  Yes.

14          THE COURT:  All right.

15   BY MR. BAGNELL:

16   Q    What is that garment, Marcie?

17   A    This would be my polo shirt that I had on that day

18   that was cut off of me by EMS.

19   Q    By EMS.  Okay.  And what else is there?

20   A    This is also my hoodie that was cut off by EMS.

21   Q    Okay.  Is your vest there, your tactical vest

22   there?

23   A    No.  This would be my jacket.

24   Q    Okay.  Thank you, Marcie.

25          Okay.  Now, Marcie, regarding the clothing you

M. Vadnais - Redirect

1  were wearing that morning, did anyone at LCSO or

2  Internal Affairs criticize you for wearing, as

3  Mr. Kelly said, three layers of clothing?

4  A    No.

5  Q    It was February, correct?

6  A    Correct.

7  Q    Was it cold?

8  A    Correct.

9  Q    I think he may have referenced three layers of

10 clothing on or near your belt.  At any time were there

11 three layers of clothing on your duty belt, your gun

12 belt?

13 A    No.  My polo shirt would have been tucked in.  My

14 hoodie and the jacket I slightly tuck behind where my

15 weapon sits.  So, again, same practice, I have clear

16 access to my weapon if I need it.

17 Q    Marcie, Mr. Kelly asked you some questions about

18 the Internal Affairs investigation with Sergeant

19 Berger.  Do you recall that?

20 A    Yes.

21 Q    All right.  I think you testified earlier that you

22 had been given squad counsel; is that correct?

23 A    Correct.

24 Q    All right.  Do you recall a general -- first of

25 all, let me ask you:  What is a general order of the

M. Vadnais - Redirect

1   Loudoun County Sheriff's Office?

2   A    It's basically our policy guidelines that we are

3   expected to follow.

4   Q    All right.  Do you recall that Sergeant Berger at

5   some point brought up General Order 308(g)?

6   A    Correct.

7           MR. BAGNELL:  Your Honor, I'd like to offer

8   Plaintiff's Exhibit 22, LCSO General Order 308(g).

9           THE COURT:  Any objection?

10          MR. KELLY:  No objection.

11          THE COURT:  All right.  It's in.

12          Are you going to publish it so the jury can

13  see it?

14          MR. BAGNELL:  Yes, Your Honor.  I'm getting a

15  copy.

16          THE COURT:  All right.  Ask your question

17  while this is trying to go up.

18  BY MR. BAGNELL:

19  Q    Okay.  Do you have the exhibit, Marcie?

20  A    Yes.

21  Q    Can you read 308(g)?

22  A    Do you want me to read the entire general order or

23  the one that I was given squad counseling on?

24  Q    The squad counseling.

25          MR. BAGNELL:  Corey, if you could, raise that

M. Vadnais - Redirect

1 up a little bit.

2 BY MR. BAGNELL:

3 Q    The one that you received squad counseling on,

4 Marcie.

5 A    With respect to number three:  Each deputy shall

6 be held strictly accountable for the proper care,

7 security, use, maintenance, and operational readiness

8 of all uniforms, equipment, and accessories issued to

9 him or her by the agency.

10 Q    And the subsection (a) under that?

11 A    Any defective, damaged, lost, or stolen property

12 shall be immediately reported to the deputy's immediate

13 supervisor and the property section.  If the property

14 is lost through negligence or intentionally damaged,

15 the employee responsible may be subject to

16 reimbursement charges and/or disciplinary action.

17 Q    Did Sergeant Berger tell you that you had done

18 something wrong with the defective property in your

19 possession?

20         MR. KELLY:  Objection, leading.

21         THE COURT:  Sustained.

22 BY MR. BAGNELL:

23 Q    What did Sergeant Berger say that you did that

24 violated any part of this general -- or allegedly

25 violated any part of this general order?

M. Vadnais - Redirect

1  A    He told me that it was because my firearm had

2  discharged and that I needed to speak to the major for

3  further explanation.

4  Q    Because it had discharged?

5  A    Yes.

6  Q    Did he do any forensic investigation to the weapon

7  to your knowledge?

8  A    Not to my knowledge.

9  Q    Have you ever been cited for violating any general

10 order before this incident, Marcie?

11 A    No.

12         MR. BAGNELL:  That's all the questions that I

13 have, Your Honor.

14         THE COURT:  All right.  Is there any recross,

15 Mr. Kelly?

16         MR. KELLY:  No, Your Honor.

17         THE COURT:  All right.  Thank you.  You may

18 step down now.

19    (The witness stands aside.)

20         THE COURT:  All right.  Your next witness?

21         MR. BAGNELL:  Your Honor, it will be

22 Kristofer Vadnais.

23         THE COURT SECURITY OFFICER:  We still have

24 all this evidence down here with the clothing, ma'am.

25         THE COURT:  All right.  Let's do it quickly.

1  I want to get this next witness on.

2           THE COURT SECURITY OFFICER:  We can do it

3  later.

4           It does say they are marked biohazard on the

5  bags.

6           THE WITNESS:  I figure since it's my blood, I

7  don't mind shoving it back in the bag.

8           THE COURT:  All right.  We'll give the

9  jury -- you're getting your afternoon break.  My normal

10 pattern would be to have a break around this time

11 anyway.  I'll give you until quarter of.

12      (Recess from 4:32 p.m. until 4:46 p.m.)

13      (The jury is not present.)

14          THE COURT:  Before we bring the jury in, one

15 of the jurors -- and it shows you how attentive our

16 jurors are -- recognized the name Dr. Aguiar.  Did

17 we -- all right.  How did he treat you?

18          THE WITNESS:  He was the second opinion

19 doctor that I went and saw.

20          THE COURT:  Is he a witness in this case?

21          THE WITNESS:  No, ma'am.

22          THE COURT:  All right.  One juror,

23 apparently, recognized the name and said that he is

24 treated for some orthopedic issue by that doctor.

25 Since he's not going to be a witness in the case, are

1    any of his reports --

2             You can have a seat.

3             -- are any of his reports going to be cited

4    by any of the other doctors in this case?

5             MS. HOOE:  Your Honor, I don't think any of

6    the other reports are going to be cited, but I think

7    that we may use that note from Dr. Aguiar with

8    Dr. Fleeter, our orthopedic doctor.

9             THE COURT:  Is there any objection to that?

10   Do you want me to *voir dire* that juror or just let it

11   be since this is not going to be a witness who actually

12   comes into court whose credibility has to be assessed?

13            MS. HOOE:  Correct, Your Honor.  We're okay

14   with it.  We don't see a need to *voir dire* the juror.

15            THE COURT:  How about the --

16            MR. BAGNELL:  Your Honor, I guess it's

17   possible on rebuttal if Dr. Fleeter -- his opinion is

18   that everything is fine, she's perfectly healed.  To me

19   it's rebuttal or impeachment evidence that we could

20   possibly use on rebuttal.

21            THE COURT:  Well, I sort of wish you'd -- you

22   know, you're supposed to run the names of all the

23   potential witnesses, all the potential witnesses so

24   that we don't get a problem like this with a juror all

25   of a sudden recognizing one of the names.

1              MS. HOOE:  Well, Your Honor, to clarify, are
2    you saying you're going to call --
3              MR. BAGNELL:  No, I'm not going to call him.
4              THE COURT:  All right.
5              MS. HOOE:  We're both agreeing we may use the
6    note.
7              THE COURT:  So does the plaintiff have any
8    problem with this juror remaining in the jury box?
9              MR. BAGNELL:  No.  No, Your Honor.
10             THE COURT:  All right.  I will just tell the
11   jurors -- because I think it's great when they
12   volunteer information -- that we understand one of the
13   jurors may be treated by Dr. Aguiar but he's not going
14   to be a witness in the case.
15             MR. BAGNELL:  All right.
16             MS. HOOE:  That's fine, Your Honor.  Thank
17   you.
18             THE COURT:  Let's bring the jury in.
19             THE COURT SECURITY OFFICER:  Yes, Judge.
20             THE COURT:  Who's your witness after
21   Kristofer Vadnais?
22             MR. BAGNELL:  Your Honor, Kristofer Vadnais,
23   Marcie's husband.
24             THE COURT:  And who after that?
25             MR. BAGNELL:  Your Honor, I did want to talk

1    to the Court about that.   My experts are arriving

2    tomorrow, all of them.   The fact witnesses are coming

3    tomorrow.   I did not know that we would run until 6:00

4    today, Your Honor.   So I apologize for that.   Kristofer

5    is the last witness I have today, and everyone else

6    would then go on tomorrow.

7              THE COURT:   That can't happen again.   All

8    right.

9         (The jury enters at 4:49 p.m.)

10             THE COURT:   All right.   Ladies and gentlemen,

11   please have a seat.

12             I want to commend you for being such a

13   careful jury.   One of the jurors has recognized the

14   name of Dr. Aguiar and brought it to our attention.

15   Dr. Aguiar's not going to be testifying as a witness in

16   the case, so I don't believe there's any problem with

17   the juror who's being treated by that doctor.

18             That's the kind of care that we greatly

19   appreciate.   As I said, I think we have the best jury

20   pool in the country up here.   So we appreciate you

21   bringing that to our attention.

22             And, again, anytime during the trial anything

23   hits any juror that you feel perhaps I should know

24   about, don't hesitate to let us know.

25             We're ready to proceed with the next witness.

K. Vadnais - Direct

1          Mr. Vadnais, please.

2      KRISTOFER VADNAIS, PLAINTIFF'S WITNESS, AFFIRMED

3                    DIRECT EXAMINATION

4   BY MR. BAGNELL:

5   Q    Mr. Vadnais, will you state your full name for the

6   record, please.

7   A    Kristofer Vadnais.

8   Q    Where do you reside?

9   A    Stephens City, Virginia.

10  Q    Are you the husband of Marcie Vadnais?

11  A    Yes, I am.

12  Q    How long have you been married?

13  A    Almost 19 years.

14  Q    And how many children do you have?

15  A    Three.

16  Q    And what are their names?

17  A    Cameron, Abigail, and Mackenzie.

18  Q    Mr. Vadnais, I want to bring your attention back

19  to the events in February 2018 and before that as well.

20       You were married when Marcie expressed an interest

21  in becoming a law enforcement officer; is that correct?

22  A    Yes, sir.

23  Q    Did she have any experience with guns at that

24  point in her life that you know of?

25  A    Yes, sir.

K. Vadnais - Direct

1  Q    What kind of experience?

2  A    I'm not sure to the full extent, but I know she

3  had spoken with -- having her -- her father had guns.

4  Q    Had she had any mishaps with firearms at the time

5  that she joined the LCSO?

6  A    None that I'm aware of.

7           MR. KELLY:  Objection.

8           THE COURT:  What's the objection?

9           MR. KELLY:  Hearsay.

10          MR. BAGNELL:  Personal knowledge.

11          THE COURT:  All right.  You don't have to

12 object to every small defect in a question.  I'll

13 sustain the objection, but this is going to be a long

14 trial if we have an objection to every question.

15 BY MR. BAGNELL:

16 Q    May I call you Kris, Mr. Vadnais?

17 A    Yes.

18 Q    Kris, did you support Marcie's desire to become a

19 police officer?

20 A    Yes, I did.

21 Q    Why was that?

22 A    She had said from the day we met that's something

23 she had always wanted to do.

24 Q    All right.  You've been married you said 19 years?

25 A    Almost 19.

K. Vadnais - Direct

1  Q     All right.  At any time during those 19 years,

2  Kris, was Marcie ever arrested for a domestic incident?

3  A     No.

4  Q     Was she ever -- did she ever express any suicidal

5  ideation or thinking to you?

6  A     No.

7  Q     Your children at this point are how old now?

8  A     Seven, thirteen, and eighteen.

9  Q     The seven-year-old is the boy?

10  A     Yes.

11  Q     What's his name?

12  A     Cameron.

13  Q     You have a child from a prior marriage; is that

14  correct?

15  A     Yes.

16  Q     And what's that child's name?

17  A     Jeseney.

18  Q     What is it?

19  A     Jeseney.

20  Q     Jeseney?

21  A     J-E-S-E-N-E-Y.

22  Q     She lives with you?

23  A     No.

24  Q     Okay.  Did you participate in any way, Kris, with

25  Marcie's training to become a deputy sheriff at LCSO?

K. Vadnais - Direct

1  A     No, just support.

2  Q     Okay.  What kind of support?

3  A     When she went through the academy, there was long

4  hours, and I just made sure everything was square at

5  home so she didn't have to worry about anything there.

6  Q     Before the incident, Kris, can you tell the jury

7  how you divided household duties between yourselves?

8  A     It was pretty well divided.  She would do things

9  on her days off, and I would do things when she was

10 working.  There was no real set schedule as far as who

11 did what.  It was just whatever things were needed to

12 get done.  If she was home, she would do them.  If she

13 was working, otherwise I would.

14 Q     The incident that took place on February 7, Kris,

15 can you describe your knowledge of it starting from

16 the -- start from the beginning of that morning.  For

17 example, did you have any communications with Marcie

18 that morning?

19 A     It was pretty typical.  We texted a few times in

20 the morning, made sure she was up and going.  That was

21 kind of our daily routine.  I sent her another one

22 later that morning, and it wasn't long after that that

23 I got the phone call from the EMS saying that there had

24 been -- the accident, and she was on her way to the

25 hospital.

K. Vadnais - Direct

1  Q    What did you do then?

2  A    I told my boss and drove to the hospital.

3  Q    Do you have any personal knowledge of Marcie ever

4  being allegedly reckless with a firearm at any time?

5  A    No.

6  Q    Did you meet her at the hospital?

7  A    Yes.

8  Q    What was her condition at the time?

9  A    Very out of it, crying, basically sobbing the

10 whole time.  I only got to see her for a few minutes

11 before they rushed her off to surgery.

12 Q    Was she on a painkiller medication to your

13 knowledge?

14 A    Yes.

15 Q    All right.  You say you saw her a few minutes

16 before the operation; is that correct?

17 A    Yes.

18 Q    Were you asked to give consent to the operation by

19 any chance?

20 A    I don't remember.

21 Q    Which doctor did you meet with?  Do you remember?

22 A    No, I sure don't.  I don't -- I don't believe the

23 surgeon was there.  I think there might have been just

24 a nurse when I saw her.

25 Q    So did you then go to a waiting room, so to speak?

K. Vadnais - Direct

1   A    Yes.

2   Q    How long were you there?

3   A    The surgery lasted about 45 minutes, and I believe

4   I was in the room for probably -- maybe another hour,

5   maybe.

6   Q    In the room with Marcie?

7   A    No.  No.  I was in the office.

8   Q    The waiting room?

9   A    In the waiting room, yes.

10  Q    Did anyone explain to you the procedure that had

11  been done on Marcie?

12  A    I believe the doctor -- I don't know how to say

13  his last name, Gasho or -- he came in after the surgery

14  and explained what happened.

15  Q    Okay.  What was your reaction?

16  A    Kind of dumbfounded.  I wasn't -- I mean, I knew

17  that something had happened to her leg, but I wasn't

18  sure of the full extent.  Then when he explained all

19  the trauma involved, it was -- it was pretty hard to

20  hear.

21  Q    It was hard to hear and take in in that sense?

22  A    Yeah.

23  Q    At some point, I assume you were allowed to see

24  Marcie.

25  A    Yes.

K. Vadnais - Direct

1  Q    Was it that day?

2  A    Yes, when she got moved up to her room.

3  Q    And what kind of condition was she in mentally at

4  that point?

5  A    She was still asleep or under the anesthesia.

6  Q    Did you sit in the room for a while?

7  A    Yes.

8  Q    Approximately when did she come around?

9  A    Maybe another 30 or 45 minutes.

10  Q    Did you know the extent of the injury at that

11  point?

12  A    Yes.

13  Q    You were told that it was a broken femur?

14  A    I don't remember if "broken" was the word they

15  used.  They explained that it was in multiple pieces

16  and that there was now a rod there.

17  Q    Anything about shrapnel?

18  A    Yes.  He told me that due to the extent of the

19  trauma, he wasn't going to dig around to try to find

20  any more shrapnel.  He just took out what he came

21  across during surgery.

22  Q    Did you see any X-rays at this time?

23  A    I don't remember if it was then that I saw X-rays

24  or later.

25  Q    Did a doctor at some point show you X-rays?

K. Vadnais - Direct

1  A    At some point during this day, yes.

2  Q    All right.  The painkillers that Marcie was on,

3  Kris, can you describe the effect they had on your wife

4  when you first started speaking to her?

5  A    She was very loopy.  She didn't -- she knew where

6  she was but didn't know the circumstances.  And half

7  the time she knew I was there, and half the time she

8  didn't.  And later she had told me she doesn't remember

9  any of it while I was there.

10 Q    Did she say anything, you know, strange that

11 clearly indicated she was on powerful painkillers?

12 A    At one point, she told one of the nurses that she

13 saw her downstairs in the parking lot playing

14 basketball.  She described a blue dumpster that was in

15 the corner of the room, which obviously wasn't there.

16 There were multiple times where she just was incoherent

17 completely and was just mumbling the whole time.

18 Q    Did you know what kind of painkillers she was on

19 at this point?

20 A    I don't remember.  It was something through her

21 IV.

22 Q    And when did she first come down from the effects

23 of the painkillers she was given, if you recall?

24 Approximately when?

25 A    I want to say she started to become more coherent

K. Vadnais - Direct

1  that day, but that's also when they gave her more

2  because then the pain started to kick in.  It was kind

3  of a wave throughout the entire time we were there.

4  Q    Did she ever tell you, Kris, that she shot herself

5  that morning?

6  A    No, she didn't.

7  Q    Has she said that at any time since the event,

8  from February 7 to the present day?

9  A    No.

10 Q    Did you know of any prior incidents where your

11 wife attempted to hurt herself at any time?

12 A    No.

13 Q    Can you describe the effect this incident had on

14 your life, Kris, in terms of how your family and

15 household ran before this happened and how it's been

16 since then?

17 A    Directly after, it was a mess for the first -- I

18 think she was in the hospital and rehab for six weeks

19 or so, and I was there every day.  I would put the kids

20 on a bus and then get home when they would get home and

21 get them ready for bed.  They would go to bed.  And I

22 would come back the next day.  We did that every day

23 for six weeks.

24      Immediately after she got home, I had to do

25 everything.  She still -- she needed help in the

K. Vadnais - Direct

1  shower.  She needed help using the restroom.  She

2  needed help with everything.

3      Things have gradually gotten somewhat better.  She

4  can do more around the house now, but as far as like

5  laundry, we have multiple levels.  She can't carry a

6  laundry basket up or down the stairs.  She needs one

7  hand with any amount of weight to help herself up and

8  down the stairs.

9  Q    Is that still the case today?

10 A    Yes.

11     Some of the other things, dishes or whatever, she

12 can do things like that around the house now as long as

13 it doesn't involve picking up any sort of weight.

14 Q    In any way, does your wife's leg appear healed to

15 you, Kris, based on your life experience with her?

16 A    Not even close.

17 Q    Have you ever seen her run?

18 A    No.

19 Q    Did you see her run before the incident?

20 A    Yes.

21 Q    Marcie worked a lot with German Shepherd rescue;

22 is that correct?

23 A    Yes.  We volunteered to help dogs.  We've adopted

24 a few of them.

25 Q    Has the injury interfered with that work?

K. Vadnais - Direct

1  A    Yes.   She was in the process of trying to get more

2  into training with one of the local places, and since

3  the accident, she's -- we've taken -- she was able to

4  take a couple of our girls for their dogs, but she

5  hasn't done anything herself.

6  Q    The effect on your children, Kris, can you talk a

7  little bit about what you've observed since this

8  injury?

9  A    Immediately after, Cameron, I don't think, fully

10 understood at the time.   The girls were distraught.

11 The phone call when I called Mackenzie to let her know

12 I was going to the hospital was -- that was pretty

13 hard.   She was pretty upset.   They both understand her

14 job is dangerous, but I don't think either realized

15 what could happen.

16      Since then, we've had to cut back.   They're

17 very -- they're all very active.   We can't do quite as

18 much as we could as far as the amount of activities.

19 She's able to, obviously, drive them around now, but

20 there are certain ones she can't do for an extended

21 period of time, sit all day long at a softball field in

22 100 degree heat or something like that.   So they don't

23 get to do as much as they did.

24      And I don't get to take them to do as much.   We

25 used to go geocaching or hiking, all of us, or hiking.

K. Vadnais - Direct

1  She can't do anything remotely like that yet.

2  Q    And I understand the strain at some point caused a

3  separation.  Is that correct?

4  A    That's correct.

5  Q    Approximately how long did that last?

6  A    It was either six weeks or two months, somewhere

7  in that time frame.

8  Q    At some point after the incident, Sergeant Berger

9  interviewed Marcie; is that correct, Kris?

10 A    Yes.

11 Q    Were you present for that interview?

12 A    Yes.

13 Q    Where did that take place?

14 A    In our family room.

15 Q    How long were you present?

16 A    Up until the actual interview started.

17 Q    Did Sergeant Berger record that interview?

18 A    I believe so.

19 Q    Did you record it?

20 A    Yes.

21 Q    Did you -- at what point did you exit out of the

22 interview?

23 A    As soon as he basically told me that since they

24 weren't doing this at the station, they would kind of

25 like to keep it as real as possible, so it would just

K. Vadnais - Direct

1  be the two of them.

2  Q    Is this in your living room somewhere?

3  A    Yeah.

4  Q    Do you own a firearm, Kris?

5  A    Yes.

6  Q    What kind?

7  A    We have a Taurus 380.  We have a Springfield

8  9 millimeter, an AR-15, an old rifle -- I forget who

9  makes it -- that my dad gave me.  I think we have a

10 little .22 rifle in the house too and a .22 pistol.

11 Q    All right.  Ever since you've had those weapons in

12 your possession, Kris -- I assume you're licensed by

13 the Commonwealth.

14 A    I have a concealed carry, yes.

15 Q    Have there been any safety issues whatsoever with

16 any of the weapons in your home?

17 A    No.

18 Q    Any accidental discharges?

19 A    No.

20 Q    How do you store weapons?

21 A    They're locked in a safe.

22 Q    Do you know anything -- or did you know anything

23 about the P320 at the time it discharged on February 7,

24 2018?

25 A    No.

K. Vadnais - Direct

1  Q     Have you researched the weapon since then?

2  A     Yes.

3  Q     What have you found?

4          MR. KELLY:   Objection.

5          THE COURT:   Sustained.

6  BY MR. BAGNELL:

7  Q     Kris, any other effects on the marital

8  relationship between you and Marcie that this incident

9  has had?

10 A     There's been a lot of strain on it.   Intimately

11 things are considerably different.   The pain changes

12 the frequency, and everything about it has changed.

13 The stress has caused numerous fights.   It's -- it just

14 hasn't been the same as it was before, just with all

15 the court, the trial, and her pain and the recovery,

16 everything hanging over our heads.   It's been pretty

17 tough.

18 Q     Have you personally observed Marcie suffering from

19 sleeplessness?

20 A     Yes.

21 Q     Anxiety?

22 A     Very much so.

23 Q     Have you heard personally any nightmarish

24 vocalizations that she's made --

25 A     Yes.

K. Vadnais - Direct

1  Q     -- while sleeping?

2  A     Yes.

3  Q     Any specific recollections of specific statements?

4  A     Nothing crazy, more so just -- she will suddenly

5  jump up in the middle of the night and leave the room,

6  and there wouldn't really be any explanation for it

7  except she couldn't sleep.  She's tried to hide most of

8  the negative to keep the effect on the family to a

9  minimum.  To some degree or another, it's worked.

10 Q     Are you working full-time, Kris?

11 A     Correct.

12 Q     That's been the case this whole period?

13 A     Yes.

14 Q     So your work -- is it fair to say your workload

15 essentially doubled around the house?

16 A     Yes, pretty much.

17 Q     Has it had an effect on you personally?

18 A     I'm a lot more stressed dealing with trying to

19 keep her spirits up, as well as keep the kids'

20 day-to-day activities normal.  It's just -- it's a lot

21 on my shoulders to try to keep everything going as

22 normal as possible.

23 Q     Sergeant Berger ever communicate the so-called

24 results of his investigation to you?

25 A     No, I don't believe so.

K. Vadnais - Direct

1  Q     Okay.  Did he ever inform you that Marcie had

2  failed to take care of her P320 in any way?

3  A     I don't believe so.

4  Q     Was Marcie, to your knowledge, careless with

5  weapons in the sense that she failed to clean them, for

6  example?

7  A     I have no idea.  I have no clue whether she took

8  care of her service weapon that way or not.

9  Q     All right.  It's not something you would have

10 knowledge of?

11 A     No.

12 Q     The weapons you have at home, are they kept apart

13 from Marcie's service weapon?  Do you know?

14 A     The small safe that held one of the pistols held

15 her service weapon as well.

16 Q     All right.  When Marcie would come home, Kris,

17 before the incident, before this severe injury to her

18 thigh, would she ever have her duty belt on?

19 A     Yes.

20 Q     Were the children around?

21 A     Sometimes.

22 Q     And would she be walking around occasionally with

23 a duty belt on?

24 A     Yeah.

25 Q     It would have the holstered pistol, the P320?

K. Vadnais - Direct

1  A     Yes.

2  Q     Were you aware there was a chambered round in that

3  pistol at the time?

4  A     Yes.

5  Q     Did you consider it reckless in any way for Marcie

6  to be walking around her house with a holstered pistol?

7  A     No.

8  Q     Was that a normal event in your life?

9          MR. KELLY:  Objection, leading and relevance.

10         THE COURT:  I don't think it's very relevant,

11 so I'll sustain the objection.

12         MR. BAGNELL:  It's the muzzle control, Your

13 Honor, but okay.  I will move on.

14         THE COURT:  No comments, Counsel.

15         MR. BAGNELL:  I'm sorry.

16 BY MR. BAGNELL:

17 Q     Would you observe Marcie remove her duty belt at

18 home also?

19 A     Yes.

20 Q     Was her holstered weapon attached to that belt?

21 A     Yes.

22 Q     Would she place it on the bed, for example?

23 A     No.

24 Q     Where would she put it?

25 A     She would put it in the safe.

K. Vadnais - Direct

1           THE COURT:  Well, hold on a second.  The gun

2   or the belt with the gun on it?  What was going in the

3   safe?

4           THE WITNESS:  Just the gun would go in the

5   safe.

6           THE COURT:  Would the holster be with it?

7           THE WITNESS:  No, just the gun.

8           THE COURT:  So the gun would be removed from

9   the holster and placed in the safe?

10          THE WITNESS:  Yes.

11          THE COURT:  What happens with the belt and

12  with the holster?

13          THE WITNESS:  She would hang them up or set

14  them down.  I'm not sure.

15  BY MR. BAGNELL:

16  Q    And that was the practice at home?

17  A    Yes.

18  Q    All right.  And you're not familiar with how it

19  worked in a patrol vehicle, correct?

20  A    I'm sorry.  What was the question?

21  Q    Let me ask you this way:  Did you ever go out on

22  duty with Marcie on patrol?

23  A    No, not on duty.

24  Q    Did you know her personal practices inside a

25  patrol car with her weapon?

K. Vadnais - Direct

1  A     No.

2  Q     Do you think it was -- I'll withdraw.

3        Have you ever reviewed any of the marketing

4  material regarding the P320, Kris?

5  A     Yes.

6  Q     When?

7  A     After the accident.

8             MR. KELLY:  Objection.

9             THE COURT:  I think you're probably getting

10 into an area that's going to pull an objection.

11            MR. BAGNELL:  Your Honor --

12            THE COURT:  Do you want to approach the

13 bench?

14            MR. BAGNELL:  Sure.

15       (Conference at the bench, as follows:)

16            THE COURT:  All right.  Where are you going?

17            MR. BAGNELL:  One exhibit, Your Honor, is the

18 Safety Without Compromise:  SIG Sauer gun won't fire

19 unless you pull the trigger.  I was going to offer this

20 exhibit since he's seen it.  He's read it.  It goes to

21 our Count 2.

22            THE COURT:  You can get that from one of the

23 defendant's witnesses, which is the proper way of doing

24 that.

25            MR. BAGNELL:  I think I can, Your Honor.

K. Vadnais - Direct

1  Again -- Your Honor, I apologize -- part of the problem

2  here is everyone is coming tomorrow.  I don't want to

3  anger the Court but --

4           THE COURT:  I don't want you to unnecessarily

5  delay the case.  We have stuff to do.

6           I'm going to sustain the objection.  You can

7  get this piece of evidence in other ways but not

8  through the witness.  All right.

9       (Proceedings continued in open court, as follows:)

10  BY MR. BAGNELL:

11  Q    How long have you owned the weapons, Kris,

12  approximately?

13  A    Maybe ten years.

14  Q    Based on your experience owning -- you've fired

15  them during that period, I assume.

16  A    Yes.

17  Q    Based on your experience during that period, do

18  you think that a holstered weapon is safer than an

19  unholstered weapon?

20  A    Yes.

21           MR. KELLY:  Objection.

22           THE COURT:  You're going to have to object

23  faster than that.  He answered the question.  The jury

24  heard it.

25           But, again, this is just one person's

K. Vadnais - Direct

1   experience.

2           MR. BAGNELL:  Your Honor, I tender the

3   witness at this point.

4           THE COURT:  All right.  Cross-examination?

5   Any cross?

6           MR. KELLY:  No, Your Honor.

7           THE COURT:  All right.  Thank you.

8           Is anyone going to call Mr. Vadnais again

9   during the course of the trial?

10          MR. BAGNELL:  No, Your Honor.

11          THE COURT:  How about the defense?

12          MR. KELLY:  No, Your Honor.

13          THE COURT:  You're excused, Mr. Vadnais.

14  That means you can now stay in court and watch the

15  proceedings, but you're not to discuss your testimony

16  or anything you see or hear in the courtroom with any

17  witness who has not yet testified.

18          THE WITNESS:  All right.

19      (The witness stands aside.)

20          THE COURT:  Now, ladies and gentlemen, it's

21  the first day.  I know you came in early to report for

22  jury duty, so I'm going to actually let you get out a

23  little bit early tonight.

24          I want to make sure that you follow my

25  instructions about not conducting any investigation

1  whatsoever.  Don't talk about the case.  Don't e-mail

2  each other.  I know you're probably getting to know

3  each other a bit.

4           The best thing jurors can do to prepare for

5  jury service is get a good night's sleep and maybe some

6  fresh air.  I don't know how hot it is out there today.

7  I think it's been a bit stuffy in the courtroom.  We

8  have been monitoring the building people.  Hopefully,

9  tomorrow it will be more comfortable.  Sometimes they

10  overreact, and it's freezing.  So I'll especially warn

11  those of you who didn't bring a sweater or a jacket,

12  you may want to have one just in case.

13           Is it going to be a problem for any of you

14  getting here by 9:30 tomorrow?  I assume our jurors

15  live quite a distance from the courthouse.  Anyone

16  can't be here by 9:30?

17      (No response.)

18           THE COURT:  So we're going to start tomorrow

19  at 9:30.  I'm going to spend a little time with the

20  attorneys tonight trying to get the case ready so we

21  don't have so many interruptions tomorrow.  But if

22  you'll leave your notebooks here, we'll get them back

23  to you tomorrow morning, and we'll let you go at this

24  time.  We're stay in session here.

25           THE COURT SECURITY OFFICER:  Rise for the

1   jury.

2        (The jury exits at 5:16 p.m.)

3          THE COURT:  All right.  You can have a seat

4   for a second.

5          I'm not pleased, Mr. Bagnell, with the fact

6   that you didn't have another witness here.  This cannot

7   happen again.  So my warning, again, is if any side

8   finishes with their witnesses and there's still extra

9   time and they think they have more witnesses coming the

10  next day, you've rested.  All right.  This cannot

11  happen again.  It's wasting the jury's time.

12         But I want to know -- because I think I've

13  mentioned this to you before during some of our

14  pretrial hearings -- did you all try to settle this

15  case?  There was an effort made, was there not, at some

16  point?  Was there ever a mediation that you ever were

17  involved with?

18         MR. JOYCE:  Yes, Your Honor, briefly.  There

19  was mediation before Judge --

20         MS. HOOE:  Judge Poretz, Your Honor.

21         MR. JOYCE:  -- Judge Poretz.

22         THE COURT:  He's an excellent mediator.

23         MR. JOYCE:  Yes.  He worked hard, Your Honor.

24  He did.  And he stayed with it.  There was -- I don't

25  want to raid the confessional, Your Honor, but

1   thereafter -- subsequent to the mediation, there was a

2   revised demand from the plaintiff and then a response

3   by the defendant, and that's where it is right now.

4          THE COURT:  Well, you know, we used to have a

5   judge, Judge Merhige -- you from Richmond might

6   remember Judge Merhige -- and he was famous for cases

7   like this for, in the middle of the trial, calling

8   everyone into the chambers and sitting down and having

9   you all settle.

10          I don't quite have that approach because I

11   think settlement always has to be a voluntary process,

12   but I have to tell you:  From what I've heard so far

13   today, I think it would be extremely wise to give it

14   one more shot to see if you can settle.  There's never

15   a guarantee as to what's going to happen with juries.

16   They continuously fascinate me with what they do and

17   what they don't do.

18          I don't know what the numbers were.  There

19   was, obviously, something on the table.  I don't know

20   whether it came close to anything near the -- I think I

21   may have used the term, if you will, before --

22   ballpark.  Most of us who mediate try to get the

23   lawyers at least into a ballpark, and then you can play

24   ball.  If you can't get into the ballpark, then it

25   doesn't really go anyplace.  Did you ever get into the

1    ballpark where you were somewhat within the range of a

2    reasonable effort to settle?

3            MR. JOYCE:  Again, I'm not looking to raid

4    the confessional here, but we are closer than we used

5    to be.  Let's put it that way.  That's about the best I

6    can say.

7            THE COURT:  Well, I think there ought to be

8    serious thought given to that.  That's what I'll say

9    for that.

10           The other thing is when I do mediation --

11   and, obviously, I can't truly mediate this case other

12   than just to give you sort of an encouragement.

13           Mr. Bagnell, has Deputy Vadnais had any

14   mental health treatment?

15           MR. BAGNELL:  My understanding is she has had

16   some, Your Honor.  I didn't want to go into it, but she

17   has had some, yes.

18           THE COURT:  I don't know why you're ashamed

19   of that.  I mean, frankly, from the many cases I've

20   heard, I would be surprised if there's not somewhat of

21   a post-traumatic stress syndrome diagnosis.  She needs

22   counseling.  Eighteen months after a traumatic incident

23   to have this degree of emotion --

24           You need to care about your client.  Lawyers,

25   in my view, are not just, you know, hired guns.  You

1  are both counselors, as well as attorneys at law.  I

2  think that there needed to be some real serious

3  counseling for this plaintiff.  I'm surprised with the

4  damage claims that you've got in this case that there's

5  not a damage claim for mental health.

6          You don't have a mental health doctor; do

7  you?

8          MR. BAGNELL:  Well, Your Honor, to be candid

9  and to use Bob's phrase, not to raid the confessional,

10 there's a limit in terms of expenses.  Ms. Vadnais and

11 her family are not wealthy people.  This case has been

12 extraordinarily expensive.  The accumulation of -- that

13 would not be covered by insurance.  I assure you I care

14 very much for my client.  We've talked about all of

15 these issues in depth for the last 18 months.

16         That is something -- whether she has PTSD or

17 not, Your Honor, I don't think it's been formally

18 diagnosed.  It wouldn't surprise me.  She certainly

19 testified about all the symptoms.  I think if the jury

20 were to return a verdict, they'd have enough to award

21 her compensatory damages.

22         But I am in constant contact with Marcie.  No

23 way am I a hired gun.  It's probably obvious, but she

24 and I will stay in touch no matter what happens after

25 this case.

1          THE COURT:  I recognize that there's very

2   strong feelings that -- and, obviously, it was

3   expressed from the witness stand -- that the SIG Sauer

4   is an evil company and they've put this dangerous

5   product out there.  You may or may not be able to show

6   that with the evidence.  But I will tell you that the

7   argument about the holster is a very interesting

8   argument, and juries in this jurisdiction tend to be

9   very rational in how they approach things.  Again,

10  there may also be jurors terribly moved by the fact --

11  and I've said this before -- a very, very attractive

12  plaintiff, somebody who's a law enforcement officer, a

13  woman who wanted to serve the community, et cetera.  So

14  these, I'm sure, are issues that Judge Poretz raised

15  with you during the course of mediation.

16          But it's worth both sides -- now that you're

17  starting to see how the case is going and the various

18  bumps that it's had along the way -- there are still

19  expenses that can be saved.  There are several days of

20  trial.  There are expensive experts that are on the

21  witness list.  You know, for both sides, there are

22  really good reasons to try to settle.  There would be

23  no finding of liability for SIG Sauer in this case.

24          In the plaintiff's case, even if the

25  plaintiff wins a judgment, it may not be anywhere near

1  what she's expecting or hoping for, and these expenses

2  have to be covered.  I think that probably the

3  litigation has been part of the problem with the

4  overall healing as well.  In fact, I think that

5  Mr. Vadnais mentioned the stress of the litigation.

6           So if there's a number that could reasonably

7  satisfy both sides, it's not too late.  That's the main

8  thing.  You have a little time tonight.  But I'm going

9  to encourage you to keep talking about trying to

10 resolve the case if you can.

11          So having said that, you can leave everything

12 here.  I don't have any other case coming in tomorrow

13 morning.  We will start promptly at 9:30 tomorrow.

14 Your witnesses need to be here promptly at 9:30 ready

15 to go.

16          Is there anything else we need to address

17 this evening?

18          MS. HOOE:  Your Honor, just briefly,

19 Mr. Bagnell and I spoke during the break about the

20 housekeeping issue about the exhibits.

21          THE COURT:  Yes.

22          MS. HOOE:  Specifically, the exhibit with

23 regard to the pants, Your Honor expressed that she

24 would rather have the jury have photographs as opposed

25 to --

1          THE COURT:  They can't have biohazardous

2  materials.

3          MS. HOOE:  Understood, but there is an error

4  on the record.  So the exhibit -- I think it was 51

5  that was referenced as being substituted.  It's

6  incorrect.  We found the correct exhibit.

7          THE COURT:  All right.  It's plaintiff's

8  exhibit or defense's exhibit?

9          MS. HOOE:  It's Defense Exhibit 12, Your

10  Honor, and it starts at page 34.

11          THE COURT:  Wait.  Hold on one second.

12          You said 34?

13          MS. HOOE:  It starts at page -- yes, Your

14  Honor, it starts at page 34 of Defense Exhibit 12.

15          THE COURT:  All right.  Hold on.

16          MS. HOOE:  And if it's easier for me to read

17  off the Bates numbers, I can do that.

18          THE COURT:  No.  I've got it.  Yes.  That's

19  an excellent photograph.  All right.

20          MS. HOOE:  Well, there are a series of them.

21  I don't think there's any objection from our side to

22  using them.  I think Mr. Bagnell was okay with using

23  all of them.  I think there's about six photos.

24          THE COURT:  Defense 35 --

25          MS. HOOE:  Defense 12, Your Honor.

 1          THE COURT:  No.  I know Exhibit 12, but

 2  within that, the Bates stamp numbers that end in 35,

 3  36, 37, 38, 39 -- are you using 40 as well?  That's

 4  pretty hard to see.  It's pretty dark.

 5          MS. HOOE:  We're happy to take it out, Your

 6  Honor if Mr. Bagnell doesn't have an objection.

 7      (Counsel confer.)

 8          MS. HOOE:  Your Honor, Mr. Bagnell would like

 9  to keep it in.

10          THE COURT:  All right.  So 35 through 40 of

11  Defense Exhibit 12 are in evidence.

12          MS. HOOE:  Yes, Your Honor.

13          THE COURT:  All right.  That's good.  That

14  takes care of that.

15          MS. HOOE:  Just lastly on this issue of

16  exhibits, I'm not sure how these exhibits are tendered

17  to the jury, but I'm assuming the entire binders won't

18  be going back.  Is that correct?

19          THE COURT:  That's correct.  We pull out of

20  the binders anything that's not explicitly moved into

21  evidence.

22          All right.  So that takes care of 12.  And

23  there may be more in Exhibit 12 -- I don't know -- when

24  you put your case in.  But at this point, those are the

25  only ones that are actually in evidence.

1          MS. HOOE:  Correct, Your Honor.

2          THE COURT:  Anything further?

3          MR. BAGNELL:  Your Honor, I just mentioned --

4     the only reason I asked Marcie to open those exhibits

5     was because there was a case recently where the jury --

6     the case was dismissed because the jury never saw the

7     actual product at issue, and that's why we went through

8     that process.  That's the only reason I did that.

9          THE COURT:  But these aren't the products

10    that are at issue.  I mean, this is evidence, but the

11    product is the gun.

12         MR. BAGNELL:  Correct.  In that case, Your

13    Honor, the plaintiff somehow did not actually show the

14    defective product, and the case was thrown out.  So I

15    just wanted to err on the side of caution.

16         THE COURT:  All right.  Anything further?  If

17    not, we'll recess court for the evening.  All right.

18         -----------------------------------
                    Time:  5:27 p.m.
19

20

21
           I certify that the foregoing is a true and
22
      accurate transcription of my stenographic notes.
23

24
                              _____
                                    /s/
25                            Rhonda F. Montgomery, CCR, RPR